In re Complaint Concerning Judge John T. McDONOUGH, Judge of County Court for Washington County.

No. 49278.

Supreme Court of Minnesota.

March 23, 1979.

On Motion For Supplemental Order April 4, 1980.

Lindquist & Vennum, Edward J. Parker, Krause, Rollins, Piper, Oman & Alvey and Harry C. Piper, III, Minneapolis, George C. King, Chairman, Board of Judicial Standards, George Kurvers, Exec. Secy., St. Paul, John E. Simonett, Little Falls, for petitioner.

Larkin, Hoffman, Daly & Lindgren, James P. Miley, Richard J. Sheehan, James E. Strother, Minneapolis, for respondent.

Heard, considered, and decided by the court en banc.

KELLY, Justice.

This is an independent review by this court of the Findings and Recommendation of the Board on Judicial Standards that John T. McDonough for 23 years probate, juvenile and now county judge of Washington County, be censured and retired. After lengthy consideration of the extensive transcript, exhibits, and other materials in this case and contemplation of the disposition appropriate to these unique circumstances, we modify the Board's recommendation and order that Judge McDonough is censured for the violations of the Code of Judicial Conduct inherent in the incidents discussed herein and shall forfeit 3 months' salary as a fine.

The Board on Judicial Standards initiated an investigation of Judge McDonough in September of 1976. Formal proceedings began with the service of a Notice of Inquiry on May 10, 1977, and a Complaint on June 15, 1977. On July 17, 1977, upon the

request of the Board, this court appointed The Honorable Thomas J. Stahler, District Judge of the Eighth Judicial District, as referee to hear evidence in the matter. Judge Stahler conducted 22 days of hearings beginning November 15, 1977, and ending December 22, 1977. The resulting record consists of over 4,000 pages of testimony and 245 exhibits. In March of 1978, Judge Stahler submitted to the Board his report, consisting of a statement, findings of fact, and special findings, as follows in its entirety:

## "BEFORE THE BOARD ON JUDICIAL STANDARDS

### "NO. 76–36

### "INQUIRY CONCERNING JUDGE JOHN T. McDONOUGH "JUDGE OF COUNTY COURT "FOR WASHINGTON COUNTY

*"STATEMENT OF PROCEEDINGS HAD*

"Following the filing of a Complaint by Petitioner Board on Judicial Standards against the Respondent, Judge John T. McDonough of the County Court of Washington County, and the filing of an Answer thereto by Respondent, the undersigned Judge of District Court, Eighth Judicial District, was appointed by the Supreme Court pursuant to Rule G (2) of the Rules of the Board on Judicial Standards to act as referee to conduct the hearing in the matter; copy of the appointment is hereto attached. On October 11, 1977 at 2 P.M. at Morris, Minnesota, the matter was pre-tried and pre-trial order made, copy of which is hereto attached. The actual hearing of this matter commenced on November 15, 1977 and ended December 22, 1977, and consumed 22 court days. The Petitioner produced 50 witnesses and 120 exhibits, and Respondent produced 54 witnesses and 125 exhibits; the transcript of the hearing consists of approximately 4000 pages. Petitioner was represented at pre-trial and actual hearing by Edward J. Parker and Harry C. Piper III of the firm of Lindquist and Vennum, 4200 IDS Center, Minneapolis,

Minnesota; and Respondent was represented at both pre-trial conference and actual hearing of the matter by James P. Miley of the firm of Larkin, Hoffman, Daly & Lindgren, Ltd., Northwestern Financial Center, 7900 Xerxes Avenue South, Minneapolis, Minnesota.

"Based upon the evidence adduced at the hearing and pursuant to Rule L (1) of the Rules of the Board on Judicial Standards, the Referee makes the following Findings of Fact as to the Complaint, as amended, and Answer, as amended, following the clear and convincing evidence rule established in *'In the Matter of Sandeen'*, Minnesota Supreme Court, October 27, 1977.

*"FINDINGS OF FACT*

"By written, sworn grievance dated July 15, 1974, Reverend Arvid D. Dixen reported to the Petitioner Board on Judicial Standards alleged actions by Respondent John T. McDonough which may have constituted conduct prejudicial to the administration of justice that brings the judicial office into disrepute within the meaning of M.S.A. § 490.16, Subd. 3, such that the four-year statute of limitations set forth in M.S.A. § 490.16, Subd. 3, began running four years prior to that date, or on or about July 15, 1970. Thus, Petitioner could introduce evidence of alleged actions and inactions of Respondent which occurred after July 15, 1970.

"The Board alleged in its Complaint: " '*Charge IV (1) (A):* "In 1975 Respondent presided over a three day trial in County Court between a medical doctor, Donald Herrick, and a former patient over a bill. Respondent found against the doctor. After the trial Respondent stated that Respondent was prejudiced against doctors on account of his own dealings with them. Respondent then informed counsel for the doctor that he should have filed an affidavit of prejudice against Respondent on account of his prejudice." '

*"Finding:* No evidence supporting Charge IV (1) (A) was introduced by the Petitioner and therefore said charge is found not proven.

" '*Charge IV (1) (B):* "Respondent's administration of justice has caused a significant portion of the Bar of Washington County to conclude that the decisions of Respondent favor the lawyers from certain law firms which regularly practice before Respondent." '

"*Finding:* No evidence supporting Charge IV (1) (B) was introduced by the Petitioner and therefore such charge is found not proven.

" '*Charge IV (1) (C):* Respondent acknowledged that "his impartiality might reasonably be questioned" in the matter of the estate of Nelle O. Palmer and accordingly transferred the matter to the Hennepin County Probate Judge, but later and with no change in circumstances, Respondent reasserted his jurisdiction over the said matter. Thereafter Respondent issued ex parte orders which were subsequently determined to be improper and beyond the powers of Respondent.'

"On October 8, 1971 the Respondent appointed a substitute judge, the Honorable Melvin J. Peterson, Hennepin County, to preside in the matter of the Nelle O. Palmer estate, which estate was venued in Washington County. In the Order of Assignment the Respondent stated as the reason for such assignment the following: 'The close personal relationship between Respondent and heirs of the estate.' On December 3, 1971 the Honorable Melvin J. Peterson by letter advised the Respondent that he, Judge Peterson, declined to further act in the matter of Nelle O. Palmer estate, indicating that the administration of such estate presented problems and difficulties that could be more efficiently handled by the judge in the area of Washington County. The evidence reveals that the Respondent had been receiving phone calls from creditors of the Nelle O. Palmer estate, which creditors were complaining in respect to the non-payment of bills owed by said estate; in addition, on or about December 3, 1971 the Respondent was notified by James O'Brien, Administrator with Will Annexed in the Palmer estate, and by the attorney

for such estate, Gordon Forbes, that there had been a substantial diversion of assets of the estate by Arthur Palmer. The principal assets of the estate consisted of corporate stock in the Lowell Inn. The Respondent was advised that substantial bills of the Lowell Inn operation were unpaid, such as, $18,000 in unpaid taxes, $11,000 in unpaid wine bills, and approximately $35,000 of other delinquent debts. The Respondent advised the administrator, James O'Brien, and attorney, Gordon Forbes, to be present at a meeting on December 6, 1971 to discuss the problems in respect to this estate. The attorney, Gordon Forbes, advised Arthur Palmer of such meeting both by telephone and letter. On December 6, 1971, James O'Brien as administrator requested the Respondent to resume jurisdiction over this estate due to the emergency that existed. Pursuant to such request the respondent did assume judicial control of such estate on December 6, 1971, issuing an order in the estate, which order, among other things, provided that Arthur Palmer and Maureen O. Palmer be removed as directors of the Lowell Inn corporation. Such order was made without verified application therefor and without court notice to Arthur Palmer or Maureen O. Palmer. Gordon Forbes testified that 'had he [McDonough] not asserted his powers in preventing the continued diversion of assets from said estate that the business of Lowell Inn would have been ruined or pushed into bankruptcy.' It should be noted in respect to the Respondent's Order of Assignment of October 8, 1971 that the Respondent did not state that he was disqualified, but rather that he chose not to act 'due to the close personal relationship of the Judge of Probate Court of Washington County with the heirs of the estate.' Considering the reasons given for such assignment, the emergency and change of circumstances in respect to such estate that existed on December 6, 1971, and the request of the administrator that the Respondent resume jurisdiction, the Referee makes the following

"*Finding:* That the allegation that the Respondent wrongfully assumed jurisdic-

tion over the Nelle O. Palmer estate is not proven by clear and convincing evidence.

"*Sources:*

"Pet. Ex. DDD, Oct. 8, 1971 'Order Appointing Substitute Judge'

"Pet. Ex. DDD, Dec. 3, 1971, Peterson letter to Respondent.

"Pet. Ex. DDD, Dec. 6, 1971, Order of Respondent

"Pet. Ex. FFF, May 26, 1972, Judge Bakke letter to Respondent

"Testimony, James S. O'Brien, T. Vol. 17, p. 39

"Testimony, Gordon Forbes, T. Vol. 21, p. 25

"Testimony, Robert Bakke, T. Vol. 9, p. 2

"Testimony, John T. McDonough, T. Vol. 15, pp. 153–158; T. Vol. 16, pp. 2–3

"Further, in relation to the Nelle O. Palmer estate, the record indicates that the Respondent's order of December 6, 1971 was appealed to the District Court on a Writ of Certiorari. The Honorable Robert Bakke, Judge of District Court, heard such appeal and issued an order for judgment which reversed the December 6, 1971 order of the Respondent. Upon receipt of Judge Bakke's order, the Respondent on May 12, 1972 wrote a letter of criticism to Judge Bakke stating among other things: 'Your entire Findings of Fact, Conclusions of Law and Order for Judgment manifest a rank ignorance of probate practice * * *.' The Respondent sent copies of such letter to John Rheinberger, attorney for Arthur Palmer, and to Gordon Forbes, attorney for the estate of Nelle O. Palmer.

"*Finding:* The Respondent's letter of criticism of Judge Bakke and the sending of such letter to members of the Bar, Attorney Forbes and Attorney Rheinberger, constituted a breach of Judicial Conduct and violated Canon I of the Standards of Judicial Responsibility of March 29, 1972.

"It should be noted that after receiving letter of censure from Judge Bakke, the Respondent apologized and that Judge Bakke testified he had no complaints in respect to the Respondent since May 26, 1972.

"The Referee further finds that the Respondent's order of December 6, 1971 constituted legal error on the part of the Respondent as set forth in the Findings of Fact and Conclusions of Law of Judge Bakke. However, the evidence does not support a finding that the order was issued with any malice or intentional disregard of the law. In fact, the order accomplished nothing in addition to what the administrator, James O'Brien, had power to do under the provisions of the duly admitted Last Will and Testament of Nelle Palmer.

"Paragraph IV (1) (D) of the Complaint, as amended, reads as follows:

"*Charge IV (1) (D):* Contrary to Canons 3C (1) (c), 5C (1) and 5C (4) (c) of the Code of Judicial Conduct, Respondent has solicited and received loans or other transfers of money from persons in Washington County who were not relatives, which loans were not timely repaid, and which tended to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties and exploit his judicial position, e. t.,

'Respondent presided over the probate of the Peter C. Neilsen estate, approved the inventory and appraisal of the estate on or about January 31, 1974, and signed the final decree and distribution of the estate on or about September 17, 1975, even though Respondent then owed the estate far in excess of $8000 for payment by Mr. Neilsen as guarantor to the First National Bank of St. Paul of a loan to Respondent by the said bank, and even though the said debt of Respondent to Mr. Neilsen was not included in the inventory and appraisal of the estate.'

"The evidence disclosed that some time in the spring of 1972 on occasions when the Respondent was drinking at various bars with one Robert Vigoren, a probation officer for Washington County, that he borrowed small sums of money from Vigoren on three or four occasions, and at one time delayed in repaying Vigoren, or according to Vigoren 'made a fuss' over it, saying 'Don't bother me about it, I'll get it to you when I get time', but that he did shortly thereafter repay Vigoren.

"*Finding:* The Petitioner has not proved by clear and convincing evidence that such conduct tended to reflect adversely on his impartiality interfere with the proper performance of his duties and exploit his judicial position.

"*Sources:*

"Testimony, Robert Vigoren, T. Vol. 7, pp. 47–48.

"The record reveals that on March 4, 1963 the Respondent borrowed from the First National Bank of St. Paul the sum of $6500.00 on an unsecured promissory note, which note was due and payable on March 16, 1964 and bearing interest at six percent per annum. This promissory note was co-signed by Peter C. Nielsen. The Respondent made no payment on this loan to the First National Bank of St. Paul and on October 15, 1965 the note was paid by Peter C. Nielsen and the First National Bank of St. Paul endorsed the note over to Mr. Nielsen. On June 4, 1971 Attorney John Hannaford, acting on behalf of Peter C. Nielsen, mailed a promissory note and letter to the Respondent requesting that the promissory note to Mr. Nielsen for $6500.00 be signed and returned by the Respondent. The Respondent made no response to the Hannaford letter, nor did he sign the promissory note that was enclosed therewith. Peter C. Nielsen thereafter advised his attorney, John Hannaford, to cease any attempt to collect the alleged indebtedness from the Respondent. The original promissory note was transferred by Mr. Nielsen to a revocable trust in 1971, and such trust in its tax return for 1971 wrote off the Respondent's note and debt as worthless, taking a tax deduction therefor. Peter C. Nielsen died testate on May 12, 1973 and the Respondent signed the Final Decree of Distribution and Final Account of Distribution of representative in Peter C. Nielsen estate on September 17, 1975. The note in question never became a part of the Peter C. Nielsen estate, in that it had been assigned to a revocable trust. According to the Final Account and Final Decree, there was no property for distribution in the Peter C. Nielsen estate. The Respondent testified that on numerous occasions after March 16, 1964 he had asked Mr. Nielsen for an accounting on this indebtedness. In addition the Respondent testified that from the middle 1950's and into the 1970's, at the request of Mr. Nielsen, the Respondent had expended considerable work, time and efforts on behalf of Peter C. Nielsen in connection with an Animal Adoption Center for abandoned and lost dogs and cats, and in particular, in 1962, and for several years thereafter, at the request of Peter C. Nielsen, the Respondent worked in Nielsen's endeavors relating to humane slaughtering of animals, vivisection, utilization of animals for medical research, and housing of animals, and promotion of animal foundations, all of which Peter C. Nielsen not only was interested in, but devoted considerable time, money and effort in promoting. The Respondent also testified that it was his understanding from conversation with Mr. Nielsen, that the original promissory note had been transferred by Mr. Nielsen to one of the animal foundations which had been established by Mr. Nielsen.

"Except as hereinbefore indicated, the record is completely lacking of any proof that the alleged indebtedness was ever attempted to be collected, or that there was a demand made for payment to the Respondent. The fact that the Respondent did perform services in behalf of the interests of Mr. Nielsen was corroborated by the testimony of Mr. Frank Claybourne, attorney from the firm of Doherty, Butler and Rumble, which firm of attorneys represented Peter C. Nielsen in an effort to obtain legislation relating to an [sic] humane slaughter bill and an animal adoption center.

"*Finding:* The Referee finds that the allegations set out in Charge IV (1) (D) have not been proved by clear and convincing evidence for the following reasons:

"1. The promissory note of March 4, 1963 which was assigned to Peter C. Nielsen on October 15, 1965, was not an asset of the Nielsen estate, it having been transferred to a revocable trust by Mr. Nielsen in 1971.

"2. That said note was taken as a bad debt and worthless in 1971 in the tax return of the Nielsen Revocable Trust.

"3. The note was not considered an asset of the estate by the representative or the attorney for the Peter C. Nielsen estate (the attorney was John Hannaford, the same attorney as represented Mr. Nielsen in connection with the note in June, 1971), either in the inventory and appraisal or final account filed therein.

"4. Peter C. Nielsen in 1971 directed his attorney to cease any effort to collect the alleged indebtedness.

"5. That Hazel E. Nielsen, sole heir at law, and The First Trust Company of St. Paul, sole Trustee of Peter C. Nielsen Trust, signed written consents to the Final Account.

"6. The evidence supports the Respondent's claim that such note in the hands of Peter C. Nielsen constituted remuneration to the Respondent for work done on behalf of Peter C. Nielsen by the Respondent.

"7. The promissory note in question was not produced in evidence, nor does the record contain any evidence as to whether or not it is in existence.

"*Sources:*

"Pet. Ex. 0000, Peter C. Nielsen Estate File

"Pet. Ex. NNNN, Hannaford letter to Respondent June 4, 1971

"Resp. Ex. 125–1971 Fiduciary Return of Nielsen Revocable Trust

"Testimony, Frank Claybourne, T. Vol. 20, pp. 130–137

"Testimony, John T. McDonough, T. Vol. 12, pp. 18 et seq.

"Testimony, Robert E. Balfanz, T. Vol. 11, pp. 62 et seq.

"Testimony, Clarence Frame, T. Vol. 13, pp. 3 et seq.

"Testimony, John Hannaford, T. Vol. 20, pp. 84 et seq.

"The Board in IV (2) charges that:

" 'Respondent violated Canon 5C (4) (b):

" '[No] judge should accept a gift, bequest favor or loan from anyone except as follows:

"(b) a judge  *  *  *  may accept  *  *  *  a loan from a lending institution in its regular course of business on the same terms generally available to persons who are not judges  *  *  *.

'in the following instances:

'A. Respondent received extraordinary and highly favorable treatment from the First National Bank of Stillwater during a period in which he appointed said bank as administrator of the estate of Sheldon Smith despite the objection of the testator's son and beneficiary and despite the desires as formally expressed by said testator.

'B. During the period described in 2 (A) above, Respondent judicially administered the estate of Nelle O. Palmer. One of the estate assets was the stock of the corporation which controlled the Lowell Inn. Improperly, without lawful authority, and over the protests of beneficiaries, Respondent ordered the appointment of the President of the said First National Bank of Stillwater to be a director of the said controlling corporation.'

"In respect to IV (2) (A) above, the evidence shows that Sheldon E. Smith died testate on April 24, 1974, a resident of Stillwater, Minnesota, and his Last Will and Testament was duly admitted to probate on May 29, 1974.

"The Last Will and Testament of Sheldon Smith, and more particularly the Codicil thereto, nominated William D. Klapp, (President of First National Bank of Stillwater), Neil E. Smith, (son of the testator), Eleanor June Norris, (daughter of the testator), Lyle J. Eckberg, (attorney for the decedent and the estate), as the executors. The record shows that William D. Klapp and Lyle J. Eckberg declined to act as executors of the estate. That at a pre-hearing conference on May 29, 1974 at which Neil E. Smith, Eleanor June Norris, Sophie R. Smith, surviving spouse, and Lyle J. Eckberg, were present, that Sophie R. Smith and Eleanor June Norris, and Lyle Eckberg, as attorney for the estate, nominated the First National Bank of Stillwater as co-administrators of the estate of Sheldon Smith.

There was no objection made or appeal taken at such time to such appointment. There is no evidence in the record showing that the Respondent influenced, promoted, solicited or recommended the appointment of the First National Bank of Stillwater as co-administrator of the estate.

"Further the record shows that on October 26, 1975, pursuant to a written agreement between Neil E. Smith, Eleanor June Norris, co-executors, Sophie R. Smith, and the First National Bank of Stillwater, Neil E. Smith was relieved of his obligations as co-executor of the estate. It should be noted that Neil E. Smith, as one of the co-executors, petitioned the court to issue an order pursuant to this agreement, and in addition to his distributive share received $5000 as his fee for acting as co-executor of the estate, less a debt which was owing the estate by said Neil E. Smith, and order was issued by the Probate Court, and Neil E. Smith had no further interest in the estate of Sheldon E. Smith.

"*Finding*: That although the Respondent was receiving favorable treatment from the First National Bank of Stillwater on or about May 29, 1974, the Petitioner failed to prove by clear and convincing evidence that the appointment of First National Bank of Stillwater as co-administrator C.T.A. of the estate of Sheldon E. Smith was influenced by such favorable treatment. (See Finding on page 13)

"*Sources:*

"Pet. Ex. EEEE, Sheldon E. Smith Probate file.

"Pet. Ex. WWWW, Document drawn by John Jewell, First Natl. Bank, Stillwater, listing estates handled by said Bank.

"Testimony, Lyle Eckberg, T. Vol. 17, pp. 10–11, 31–33

"Testimony, Neil E. Smith, T. Vol. 11, pp. 38 et seq.

"Testimony, John Jewell, T. Vol. 12, pp. 232–262

"Testimony, John T. McDonough, T. Vol. 15, pp. 159–167

"In respect to the charge set forth in IV (2) (B) above, the record shows that the Last Will and Testament of Nelle O. Palmer provides as follows:

" 'I direct my executor and trustee to continue to elect William D. Klapp as one of the three directors of these corporations as long as he is willing to serve in that capacity, and a second director acceptable to him so long as he continues as a director.'

Further, the record shows that William D. Klapp, President of the First National Bank of Stillwater, was a director of Lowell Inn since 1961 and continued to serve as a director thereof until 1973; that the Respondent's order of December 6, 1971 appointing William D. Klapp as a director of Lowell Inn, Inc. was requested by James O'Brien, Administrator of the estate, and had no basic legal effect in that William D. Klapp was already a director, and further was nominated under the Last Will and Testament to continue to be a director for as long as he was willing to act as such. There is no evidence in the record which would demonstrate that the Respondent solicited, promoted, or requested the appointment of William D. Klapp as director. It should further be noted that the evidence shows that William D. Klapp received no compensation for his services as such director during the entire period from 1961 through 1973. Under such circumstances it would be hard to infer that the Respondent received preferential treatment by Mr. Klapp due to his being an unpaid director of Lowell Inn, Inc.

"In respect to the Respondent's financial dealings at the First National Bank of Stillwater, the record shows that for many years a checking account was maintained at the First National Bank of Stillwater in the name of Mary H. McDonough. That the Respondent regularly and routinely deposited his judicial salary into such account and used such account in transactions relating to the Respondent, such as the payment of Bar Association dues and other personal obligations. The record shows that during the period from July 15, 1970 through December, 1976 there were an unusual number of overdrafts in this account. There was no

charge made by the First National Bank of Stillwater on a great number of such overdrafts. The record shows that such overdrafts continued over long periods in amounts ranging from a few dollars to over $2000. The overdraft position of the account for the period referred to is as follows:

| Period | No. Overdrafts | Working Days in Overdraft Condition | % Working Days in Overdraft Condition | No. Overdraft Charges |
|---|---|---|---|---|
| Last Half 1970 | 91 | 85 of 130 da. | 65.4% | |
| 1971 | 147 | 110 of 260 da. | 42.3% | |
| First half 1972 | 321 | 107 of 130 da. | 82.3% | |
| First half 1973 | 100 | 108 of 130 da. | 83.1% | 57 |
| 1974 | 131 | 70 of 260 da. | 27.0% | 4 |
| 9 mo. 1975 | 82 | 84 of 195 da. | 43.0% | 2 |
| 1976 | 30 | 73 of 260 da. | 28.0% | 8 |

"The overdrafts above for which no charge was made constitute an interest-free loan by the bank.

"In addition, during the 1960's, the Respondent made a loan from the First National Bank of Stillwater, which loan was *basically unsecured*. This loan was renewed from time to time through 1977. By April 29, 1968 this loan had grown from $1150 to $15,200, and by April 12, 1977 was in the amount of $19,491.72. The loan was carried from year to year; its main growth resulted from the addition of unpaid interest to the principal. The Respondent did make a few insignificant payments on such loan over the period of years. The loan was adversely commented upon by the bank examiners in the years 1970, 1972, 1973, and 1975. Over the period interest in excess of $2400 was forgiven and not added to new loan amounts. Considering the Respondent's financial statement, the fact that this loan is basically unsecured in and of itself contradicts all good banking practice and establishes preferential treatment.

"During this period of time the Respondent was under severe financial pressures. The financial situation was caused by low income, periodic illness of the Respondent and his wife, and periodic illness requiring surgeries on numerous occasions both to the Respondent and his wife. In addition the Respondent and his wife had five children to support and educate. The money received from this loan was used for the payment of the household, medical, living, and educational expenses of the children. The extraordinary medical expenses of the Respondent are evidenced in his income tax returns for the years 1970 through 1976, which expenses were over and above health and accident insurance provided through his employment. Sympathy for the Respondent due to the foregoing was given as the reason by Mr. Klapp and Mr. Peterson for their unusual treatment of Respondent's loan.

"Presently the Respondent is not without assets. His financial condition is benefited by increased judicial salaries, his homestead, due to appreciation, is now worth approximately $100,000, less mortgage of $24,000, and he has some possibilities of earning extra-judicial income as a lecturer and writer. The Respondent stated his willingness to secure such loan and liquidate such loan on an installment basis.

"*Finding*: 1. That the Respondent did receive and did accept preferential treatment by the First National Bank of Stillwater, a lending institution, in respect to his finances, which, in the regular course of business of said institution was not available to others, in violation of Canon 5C (4) (b).

"2. That although the Respondent received preferential treatment from the First National Bank of Stillwater, there is no clear and convincing evidence that preferential treatment or favoritism flowed from the Respondent to the First National Bank of Stillwater because of such preferential treatment. There is no direct evidence that the Respondent ever solicited, requested or recommended that the First National Bank of Stillwater or any of its officers be nominated and appointed to act in any capacity in the administration of a decedent's estate, guardianship, or conservatorship. No evidence was presented which would show any fee which the First National Bank or any of its officers received as executors, appraisers or administrators or conservators was in excess of that allowed under the law, or was not commensurate with the duties performed.

"*Sources* :

"Pet. Ex. XXXX, YYYY, ZZZZ, and AAAAA, Summaries prepared by John Speak.

"Testimony, Alan R. Peterson, T. Vol. 12, pp. 130 et seq.

"Testimony, John T. McDonough, T. Vol. 9, pp. 196–199; and T. Vol. 12, pp. 33–46

"Testimony, John Speak, T. Vol. 13, pp. 16 et seq.

"Testimony, Robert E. Balfanz, T. Vol. 11, pp. 62 et seq.

"Testimony, A. R. Kircher, T. Vol. 13, pp. 57 et seq.

"Testimony, James C. Graham, T. Vol. 13, pp. 79 et seq.

"Pet. Ex. PPPP, Respondent's financial statement of July 2, 1975

"Pet. Ex. QQQQ, Respondent's financial statement of March 5, 1977

"Pet. Ex. RRRR, Ledger cards on Respondent's loans at First Bank, Stillwater

"Pet. Ex. SSSS, 4 notes of Respondent to First Bank, Stillwater

"Pet. Ex. TTTT, Stillwater Bank Officer's comments on Respondent's loan

"Pet. Ex. BBBBB, Summary of Respondent's small or short term loans at First Bank, Stillwater

"Pet. Ex. CCCCC, Summary of Respondent's unsecured loans at First Bank, Stillwater

"Pet. Ex. DDDDD and EEEEE, Depositions of William D. Klapp

"Testimony, Alan R. Peterson, T. Vol. 12, pp. 130 et seq. 216–217

"Testimony, Robert E. Balfanz, T. Vol. 11, pp. 62 et seq.

"Testimony, John S. Speak, T. Vol. 13, pp. 16 et seq.

"Testimony, A. R. Kircher, T. Vol. 13, pp. 57 et seq.

"Testimony, James C. Graham, T. Vol. 13, pp. 79 et seq.

"Testimony, John T. McDonough, T. Vol. 12, pp. 46–48

"Pet. Ex. EEEE, Probate File Smith Estate, including Last Will and Testament dated August 17, 1973 Codicil thereto dated April 5, 1974 Letters Testamentary signed by Respondent dated May 29, 1974

"Testimony, Neil E. Smith, T. Vol. 11, pp. 38 et seq.

"Testimony, John Jewell, T. Vol. 12, pp. 232 et seq.

"The Board in Charge IV (3) charges:

" 'Respondent has violated Canon 3 Subd. A (1) of the Code of Judicial Conduct:

" 'A judge should be faithful to the law * * *.'

by imposing punishment and conditions upon defendants in alcohol and drug related cases which conform to Respondent's own belief about appropriate punishment instead of applying the law and imposing punishment in accordance with applicable statutes of the State of Minnesota, in the following particulars:

" 'A. During 1975 and 1976 [*and continuing to November 15, 1977*] * in cases in which defendants charged with driving while under the influence of alcohol

* As amended

pleaded not guilty, certain of said defendants appeared before Respondent. In Respondent's court a substantial part of such defendants were permitted to plead guilty to the lesser charge of careless driving on the condition that they attend a program of 12 semi-weekly lectures in Washington County Courthouse which program was called "The Project" and was administered by Respondent. Such procedures were in abuse of Respondent's discretion in sentencing matters.

" 'B. Since the effective date of Minnesota Statutes Section 169.126, in cases of the class described in the preceding paragraph, Respondent has consistently failed and refused, [*and continues to fail and refuse*] * to conduct pre-sentence investigations of the defendants, all in violation of said Minnesota Statutes Section 169.-126.'

"As to 'A' above, by order signed by the three county court judges of Washington County, dated January 15, 1975, 'The Project' was established. In that many of the complaints as against the Respondent arise out of the operation of 'The Project', such order is set out in full herein:

STATE OF MINNESOTA
COUNTY OF WASHINGTON IN COUNTY COURT

ORDER

"1. There is hereby established until further Order of Court as an agency of the Washington County Court, Washington County, Minnesota. *The Washington County Alcohol/Drug Survival Project,* hereinafter called The Project, with and for the general purpose:

" 'To provide scheduled, time-limited educational, preventive and treatment services on a non-residental basis to individuals, referred by the Washington County Court, or who are accepted by The Project on referral from social workers, clergy, physicians, lawyers, or other members of the helping professions, and whose physical, psychological and social status allows them to function in their usual environment, but whose alcohol and/or drug taking behavior causes problems to himself/herself or others in the home, place of employment, or community setting.'

"2. Judge John T. McDonough is hereby appointed the Administrative Judge, The Project, with full power and responsibility to initiate and implement the purpose of The Project pursuant to the attached Program Structure; with full power to appoint, hire, and assign such personnel to effectuate the purpose of The Project; with full power to supervise and direct the Director and other personnel assigned to The Project.

"3. The Administrative Judge, The Project shall appoint a Director who will be charged with:

"(a) Day by day administration of The Project.

"(b) Receiving Court orders assigning students to The Project.

"(c) Accepting applications on referrals from members of the helping professions or other public or private agencies and assign them to The Project.

"(d) Keeping and maintaining students records, attendance, progression of students in The Project.

"(e) Filing and maintaining individual records of the students in a manner that insures complete confidentiality of the records pursuant to Federal and State Statutes and regulations.

"(f) Assigning to The Project Courses group counselors, lecturers; initiating and scheduling in-service training sessions of group counselors, lecturers.

"(g) Answering all correspondence and inquiries addressed to The Project.

"(h) Prepare for the Washington County Court for its approval a budget for the ensuing calendar year on or before the 15th of each December for approval of the Judges, Washington County Court.

"(i) Forward to Administrative Judge, The Project, for approval all bills

received for services performed or materials delivered, before forwarding to County Auditor, Washington County, Minnesota, for payment.

"(j) Acting liaison between the Administrative Judge and group counselors, lecturers, consulting psychologists, consulting medical personnel, after-care referral sources utilized by The Project.

"(k) Scheduling of The Project Courses.

"4. The salary of the Director and other expenses, the fees of the lecturers, group counselors, consulting psychologist, consulting medical personnel, shall be set by the Administrative Judge with approval of the Judges, Washington County Court.

Dated this 15th day
of January, 1975

> By Order of Court
> /s/ John T. McDonough
> /s/ Searle R. Sandeen
> /s/ Howard R. Albertson

" 'The Project' was financed through a grant from the Alcohol and Drug Abuse Section, Department of Public Welfare, State of Minnesota, in the amount of $84,500. According to the record this original grant was to be a 'start-up' amount of money which was to carry 'The Project' through its first year. Thereafter, 'The Project' was to be self-sustaining by reason of anticipated income from a 'Tuition fee' charged to the persons who were assigned to it. According to the Respondent's application for extension of budget 'The Project' was designed to receive 529 students during the first year, which should have produced an annual income of approximately $78,000. During the first year of operation only 270 'students' were assigned to 'The Project' some of which were non-paying; therefore the income was not sufficient to sustain the operation. This resulted in an application for extension of budget made by Respondent, which extension was for a period from November 1, 1975 to November 1, 1976. In the application for extension of budget the Respondent recited that the lack of 'students' in 'The Project' was due to two factors: 1, extended illness of the Respondent; and 2, deficiencies in the treatment program, only 270 "students" were assigned to 'The Project'.

"The basic procedure in the operation of 'The Project' consisted of the following: an individual was charged with driving while under the influence of intoxicating beverages or having a blood content of more than .10 alcohol. Through plea bargaining the majority of those so charged were allowed to plead guilty to careless driving; such individual would be fined in the sum of $150, and as a further condition, he would be assigned to and required to attend 'The Project'; the individual would also be required, whenever he was deemed to be able to pay a 'tuition' which was in the sum of $150; the individual would then attend twelve semi-weekly sessions of 'The Project' during a six-week period. The program consisted of an analysis of the individual's drinking habits, group therapy, lectures by experienced counselors, video presentations and individual counseling. The continued existence of 'The Project' was entirely dependent upon the income derived from persons assigned thereto. Thus, there was a strong incentive for those personally interested in the success of 'The Project' to have sufficient 'students' to produce the income that would insure the continuation of 'The Project.' The Respondent was the originator of 'The Project' and administrative judge thereof; in addition, the Respondent had a dedicated interest in the alcohol problem and the success of 'The Project'. The record clearly establishes that the majority of those charged with driving while under the influence or driving with more than .10 blood alcohol, who appeared for disposition before the Respondent, eventually ended up in 'The Project'. In addition, the record shows conclusively that more than one-half of those charged as above plead guilty to the lesser charge of careless driving.

"The Respondent testified that in plea bargaining he followed the conditions and considerations outlined in 15.04, Subd. 2 [Subd. 3] (2), Rules of Criminal Procedure; also that plea bargaining was conducted by the prosecuting attorney and the attorney for the defendant prior to the same being brought before the Respondent for consideration. Petitioner produced no convincing

evidence that such procedure was not followed.

"Several attorneys representing both the prosecution and the defense in the area testified that this was the procedure that was followed in the Respondent's court and that not all those charged with D.W.I. or driving with over .10 blood alcohol were allowed to plead guilty to a lesser offense or assigned to 'The Project.'

"Washington County, according to the record, is considered a metropolitan area. The statistical figures presented in respect to those charged with D.W.I. or over .10 blood alcohol content, that were allowed to plead guilty to a lesser offense, basically compared with Hennepin County; such percentages in Washington County far exceeded the statistical percentages of the rural areas of the State of Minnesota. Colonel James C. Crawford, Chief of the Minnesota State Highway Patrol, testified that he did not criticize the plea bargaining procedure, but that he felt that according to his survey, made by the personnel of his department, that the procedure which the Respondent used in Washington County did not get the intoxicated driver 'off the road' nor did it reflect the alcoholic background on the driver's license of the repeated violator. Colonel Crawford's conclusions were based upon an overall survey and no specific incidents or cases of such practice were presented by the Petitioner.

"Robert W. Kelly, County Attorney of Washington County, on January 18, 1977 in a letter addressed to The Honorable Howard R. Albertson, which letter was in response to James C. Crawford's (Chief Minnesota Highway Patrol) letter of January 10, 1977, stated as follows:

" 'The obvious omission made by Chief Crawford in his letter of January 10, 1977, is any comment upon the blood alcohol content law (169.127) which became effective August 1, 1976, as it relates to D.W.I. prosecutions. After the passage of 169.127 and upon the arrest of a drinking driver, one of two things would occur regardless of a conviction for D.W.I., dismissal of D.W.I., or reduction to a lesser charge:

" '1. If the drinking driver (and assuming a proper arrest and offer of a chemical test pursuant to 169.123) gives a sample to determine his alcoholic content which proves to be 0.10% or more ethyl alcohol by weight, his driver's license will be suspended administratively for a period of ninety days.

" '2. If the same driver refuses to give a sample to determine the alcoholic content of his blood, his driver's license will be suspended for six months pursuant to the Implied Consent Law, M.S. 609.123, [169.123] and this is also done administratively.

" '3. However, if the driver in either of the above situations, pleads Guilty to D.W.I., the driver's license will be suspended for a period of thirty days notwithstanding M.S. 169.123 or 169.127.

" 'Consequently, it matters little from and after August 1, 1976, whether the original charge of D.W.I. is reduced or even dismissed, as the driver is down on paper for having lost his license for a drinking offense. This opinion appears to be shared by deputies, highway patrolmen and policemen. This even applies to the gross misdemeanor law passed by the 1976 legislature, M.S. 171.245, which says that a person operating a motor vehicle while intoxicated and whose license is at the time under suspension or cancellation on account of an alcohol related offense, upon conviction is guilty of a gross misdemeanor. In fact, a judge or the prosecuting attorney may even be doing a disservice to the Defendant or his attorney by reducing D.W.I. to Careless Driving and accepting a plea to the Careless Driving without disclosing that such plea bargaining will result in the driver's license of the Defendant being revoked for ninety days (169.127) or six months (169.123) instead of thirty days if the plea were made to the original charge of D.W.I.'

That since August, 1976, if the statute referred to by County Attorney Kelly were enforced, much of the criticism by Chief Crawford is answered.

"*Finding*: Considering the evidence as a whole and the broad discretion that is given

by the Rules of Criminal Procedure to the presiding judge to accept or not accept plea bargaining, the Referee finds that the Petitioner did not prove by clear and convincing evidence that the sentencing procedure of the Respondent in respect to driving while under the influence of intoxicating beverage or driving with more than .10 blood alcohol content constituted an abuse of judicial discretion. However, the position of the Respondent in respect to 'The Project', the basis upon which 'The Project' was intended to be financed, and the statistics relating to the numbers that were assigned to 'The Project', make the sentencing procedures used by the Respondent suspect and open to criticism.

"*Sources:*

"Pet. Ex. J, Order Establishing 'The Project'

"Resp. Ex. 12, Kelly letter to Albertson, Jan. 18, 1977

"Pet. Ex. R, LL, Crawford letter to Respondent, Jan. 10, 1977

"Pet. Ex. S, Albertson survey of Respondent's D.W.I. cases for period August 3, 1976 to January 5, 1977.

"Testimony, James C. Crawford, T. Vol. 5, pp. 46 et seq. Vol. 22, pp. 32 et seq.

"Testimony, Howard R. Albertson, T. Vol. 2, pp. 24–43

"Testimony, Lawrence P. Geraghty, T. Vol. 5, pp. 17 et seq.

"Testimony, John H. Rheinberger, T. Vol. 8, pp. 173 et seq.

"Testimony, Darryl Morse, T. Vol. 17, pp. 87–106

"Testimony, Jack Nordby, T. Vol. 17, p. 158

"Testimony, Frank J. Hall, T. Vol. 18, pp. 18–34

"Testimony, John T. McDonough, T. Vol. 14, pp. 137–139; 124

"In respect to the charge of the Board contained in IV (3) (B) above, M.S.A. 169.-126 provides as follows:

" '126.126   Presentence investigation

'Subdivision 1.   A presentence investigation shall be conducted in counties of more than 10,000 population and a report submitted to the court by the county agency administering the alcohol safety counseling program when:

" 'a.   The defendant is convicted of an offense described in section 169.121;  or

" 'b.   The defendant is arrested for committing an offense described in section 169.121, is not convicted therefor, but is convicted of another offense arising out of the circumstances surrounding such arrest.

" 'Subdivision 2.   The report shall contain an evaluation of the convicted defendant concerning his prior traffic record, characteristics and history of alcohol problems, and amenability to rehabilitation through the alcohol safety program. The report shall include a recommendation as to a treatment or rehabilitation program for the defendant.   The report shall be classified as private data on individuals as defined in Minnesota Statutes, Section 15.162, Subdivision 5a.

" 'Subdivision 3.   The report required by this section shall be prepared by a person knowledgable in diagnosis of chemical dependency.

" 'Subdivision 4.   The court before imposing sentence after conviction for one of the offenses described in subdivision 1 shall give due consideration to the agency's report.

" 'Subdivision 5.   Whenever a person is convicted of a second or subsequent offense described in subdivision 1 and the court is either provided with an appropriate treatment or rehabilitation recommendation from sources other than the presentence investigation provided for in this section, or has sufficient knowledge both of the person's need for treatment and an appropriate treatment or rehabilitation plan, and the court finds that requiring a presentence investigation would not substantially aid the court in sentencing, such a presentence investigation need not be conducted.

" 'Subdivision 6.   This section shall not apply to persons who are not residents of the State of Minnesota at the time of the offense and at the time of the presentence investigation.'

"The above-entitled section became effective August 1, 1976.   The Respondent ad-

mitted that during the period from August 1, 1976 to January 15, 1977, when he was assigned to handle D.W.I. cases and cases of charges of over .10% blood alcohol as referred to in M.S.A. 169.121, he did not require or provide a presentence investigation. The Respondent testified that it was his opinion that 'The Project' in and of itself constituted the presentence investigation as required by M.S.A. 169.126.

"In the procedure followed by the Respondent, the sentence was imposed prior to the individual being assigned to 'The Project', thus, the Respondent's claim is not valid. The Respondent maintains that M.S.A. 169.126 must be read in conjunction with M.S.A. 169.124; however, M.S.A. 169.-124 does not provide an alternative to presentence investigation. 'The Project', with modification, may well have been used for presentence investigation purposes to comply with 169.126 if such use had been made prior to sentencing; however, regardless of how praiseworthy the activities of 'The Project' may be, where such activities take place after sentencing such does not constitute compliance with the provisions of M.S.A. 169.124.

"*Finding*: That Respondent did fail from approximately August 1, 1976 to January 15, 1977 to comply with the presentence requirement of M.S.A. 169.126 and thus did violate Canon 3, Subd. A(1).

"*Sources*:

"Pet. Ex. L, August 27, 1976 letter from K. A. Dirkzwager, Director, Driver License Div., to Albertson

"Pet. Ex. P, August 24, 1976, Albertson letter to Kirkzwager [sic]

"Testimony, Rollis R. Odendahl, T. Vol. 3, pp. 70 et seq.

"Testimony, James T. Wrich, T. Vol. 8, pp. 54 et seq.

"Testimony, Col. James C. Crawford, T. Vol. 5, pp. 46 et seq., Vol. 22, pp. 32 et seq.

"Testimony, Patrick Griffin, T. Vol. 3, pp. 123 et seq.

"Testimony, Howard R. Albertson, T. Vol. 2, pp. 24–43

"Testimony, John T. McDonough, T. Vol. 14, pp. 143–146

"The Board alleged in its Complaint:

"*Charge 4:*

" 'Respondent violated Canon 2A of the Code of Judicial Conduct:

" 'A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

" 'A. In 1976 Respondent confronted the sheriff of Washington County and his administrative assistant about the purchase of certain office furniture. Respondent became so incited and enraged that he lost control of himself and had to be led from the room.

" 'B. In order to obtain the use of certain space in the Washington County Courthouse, Respondent threatened the County Coordinator of said county by saying to him: "I'll have your ass in jail if you interfere with those meetings" and loudly and publicly cursed certain other county personnel in connection with said incident.

" 'C. On a significant number of occasions in 1973 and 1974 and in connection with the construction of a chapel, Respondent called Howard Costello on the telephone between the hours of 2:00 A.M. and 5:00 A.M. and without identifying himself cursed at him by calling him a son-of-a-bitch, no good fucking bastard and similar names and immediately hung up. Howard Costello being well acquainted with the voice of Respondent finally was able to call him by name before Respondent could hang up, whereupon the calls ceased.

" 'D. Dr. Cherry Cedarleaf was and is a psychiatrist and the psychiatric director of the Jamestown Center for adolescent drug abusers. From July, 1972 through October, 1974, Respondent visited the Center three or four times each week and demanded the undivided attention of Dr. Cedarleaf, ostensibly about the business of "The Project", but in fact he frequently proposed that she have sexual intercourse with him.

" 'E. Respondent was exposed for significant periods of time to two persons who

were trained to do psychiatric evaluation, Dr. C. B. Cedarleaf, a psychiatrist, and Dr. Helen Holmes, a psychologist. Both diagnosed Respondent's behavior as aberrant and in particular schizophrenic and manic-depressive. Although Respondent was frequently advised to seek treatment by Dr. Cedarleaf, he refused. A principal symptom of the said mental diseases is inability to perceive reality which symptom is unacceptable in a judge.

" 'F. Respondent arranged for Mario Arcy to obtain and wear the badge of a Washington County Probation Officer and to pass himself off as such officer whereas in fact Mario Arcy was not a Washington County Probation Officer.

" 'G. During the years 1970 through 1974, Respondent abused his judicial authority by compelling officials of the City of Stillwater and of Washington County to drive him to, between and from taverns in and around Stillwater.

" 'H. During 1975, 1976, and 1977, Respondent has conducted his official and private business through threats and attempted intimidation of public officials.'

"In respect to 'A' above, it is disclosed by the evidence that during the month of September, 1975, both the grand and petty juries were in session at the Washington County Courthouse and that all courtrooms were utilized; that the Respondent, who had been appointed to the committee on courtroom furnishings by the County Board, observed on a Monday that the bailiffs were moving the chairs from the courtrooms and using them as bailiffs' chairs in the hallway or corridor. The Respondent informed the bailiffs that they should cease and desist the use of such courtroom chairs. The practice continued throughout the week and the Respondent advised the sheriff of Washington County regarding this matter on two occasions, and finally went to the sheriff's office and entered into an argument with the sheriff in respect to the use of the courtroom furniture. Although such discussion between the sheriff and Respondent was heated, the evidence did not establish that the Respondent became so

excited and enraged that he lost control of himself and had to be led from the room.

"*Finding:* The Petitioner did not prove by clear and convincing evidence the charges set forth in 4(A) above.

"*Sources:*

"Testimony, Sheriff Westphal, T. Vol. 6, pp. 2–21

"Testimony, Duane C. Spoors, T. Vol. 6, pp. 66–73

"Testimony, John T. McDonough, T. Vol. 15, pp. 39 et seq.

"In respect to 'B' above, the record shows that meetings of 'The Project' were held during evening hours (after 5 P.M.) at the Washington County Courthouse. That in May, 1976 the personnel of the Washington County Courthouse were on strike. That on or about May 26, 1976, one David Champion, Washington County Coordinator, met the Respondent in the Washington County Courthouse and advised the Respondent and one Jan Hawthorne, Director of 'The Project', that due to the strike and pursuant to resolution of the County Board, that the evening meetings of 'The Project' in the courthouse would have to be cancelled in that there were not enough administrative employees to provide for security of the courthouse during the progress of such meetings. The Respondent became very angry and in the presence of others engaged Mr. Champion in a loud and accusatory manner and at one time stated to Mr. Champion: 'I will have your ass in jail if you interfere with these meetings.' The resolution of the County Board of Washington County of May 17, 1976 provides in paragraph 11:

'Use of Court House—In the event of a strike all requests for use of the court house for meetings during hours other than 8 A.M. to 5 P.M. on Monday through Friday are cancelled whether they are for outside functions or county related functions.'

The Respondent disregarded the requests of Mr. Champion and in violation of the resolution of the County Board of Washington County continued to use the premises of the Washington County Courthouse for carry-

ing on meetings of 'The Project' during evening hours.

"*Finding:* That the conduct of the Respondent in threatening the County Coordinator with jail confinement and the Respondent's refusal to abide by the resolution of the County Board of Commissioners did constitute a violation of Canon 2A of the Code of Judicial Conduct.

"*Sources:*

"Pet. Ex. PP–1, Resolution of County Board

"Pet. Ex. PP, May 20, 1976, Champion Memorandum

"Testimony, David C. Champion, T. Vol. 6, pp. 131–150

"Testimony, Bodo Suemnig, T. Vol. 6, pp. 171–172

"Testimony, Robert Vigoren, T. Vol. 7, p. 56

"Testimony, John T. McDonough, T. Vol. 15, pp. 34–37

"Testimony, Jan Hawthorne, T. Vol. 17, pp. 62–64

"In respect to 'C' above, Howard Costello, Assistant Commissioner for Corrections for the State of Minnesota, testified that beginning in the fall of 1973 and continuing for approximately six months thereafter, he received obscene phone calls from a male person and although no conversation was exchanged between the caller and Mr. Costello, the caller cursed Costello in a vile manner. That such voice calls continued until Costello stated to the caller in the spring of 1974, 'John, what's the matter?' Thereafter the speaking calls ceased but that certain phone calls were made to the Costello residence in which there was no voice heard when the phone was answered. Mr. Costello was well acquainted with the Respondent, having served with the Respondent on the State Parole Board from February, 1961 to February, 1968. Over a period of years Costello had had numerous in-person conversations with the Respondent via telephone. In the fall of 1973 the Respondent had directly communicated with Mr. Costello his dissatisfaction with the failure of the Department of Corrections to build a certain chapel at the State Prison in Stillwater

in remembrance of Father Miller. The Respondent had been the prime mover in the Father Miller Foundation, which had as its sole purpose the construction of a non-denominational chapel at the State Prison at Stillwater, and he had been highly instrumental in raising $156,000 for the construction of such chapel, which amount was turned over by the Respondent to the State of Minnesota in April, 1972. Mr. Costello positively identified the Respondent's voice as being that which he heard in the abusive phone calls. Costello's testimony is corroborated by the fact that after he identified the voice by saying, 'John, what's the matter?' he received no more voice calls. Mr. Costello testified that prior to the telephone calls outlined above, that the Respondent had in regular telephone communications between himself and Costello verbally abused Costello through cursing and making false accusations that Costello could build a chapel if he chose to, when in truth and in fact, Costello had no control over the building of the chapel, which had been delayed by the State of Minnesota due to the uncertainties that existed in respect to the continuance of the prison at Stillwater, Minnesota.

"Mrs. McDonough testified that if such calls were made from the home she would have been conscious of them; however, it was not shown that Mrs. McDonough was always present in the home or that the calls necessarily were made from the McDonough home.

"The surrounding facts and circumstances which occurred prior to the anonymous phone calls, corroborate the testimony of Mr. Costello.

"*Finding*: That the Respondent did make abusive phone calls to Mr. Costello and thereby did violate Canon 2A of the Code of Judicial Conduct.

"*Sources:*

"Testimony, Howard Costello, T. Vol. 8, pp. 219–229

"Testimony, John T. McDonough, T. Vol. 15, pp. 42–50

"Testimony, Mary McDonough, T. Vol. 20, pp. 3–5

"In respect to 'D' above, the evidence shows that Dr. Cherry Cedarleaf was a psychiatrist and has been the director of the Jamestown Rehabilitation Center for Adolescents since July, 1972. The Respondent was instrumental in the establishment and founding of Jamestown and has used such center for the treatment of juveniles of Washington County, especially those with drug addiction. The evidence shows that the Respondent during the period 1972 to June, 1973 made frequent visits to Jamestown, perhaps as often as three or four times a week. That while at Jamestown the Respondent made inquiries and personal investigation of the progress of adolescents who were placed in Jamestown by the Respondent for treatment and in addition took an active and personal interest in the operation and administration of the facility as well. The record contains no clear and convincing evidence that the Respondent's visits to Jamestown were solely for personal reasons. The record contains substantial evidence that such visits were work-related.

"That following Respondent's treatment for alcoholism in June, 1973, his visits to Jamestown facilities were greatly reduced. Doctor Cedarleaf testified that on several occasions prior to the Respondent's treatment for alcoholism that he had proposed sexual relations with her and that on at least one occasion after such treatment he made a similar proposal. The Respondent denied having ever made a sexual proposal to Doctor Cedarleaf. The evidence discloses that prior to June, 1973 that on many occasions Doctor Cedarleaf would provide transportation for the Respondent to his home in Stillwater and on some of these occasions they would stop at bars and taverns for alcoholic beverages. It was observed that Doctor Cedarleaf was a very hesitant and reluctant witness. She testified that at certain times during this period she considered herself to be in a physician-patient relationship with Respondent.

"Doctor Cedarleaf is a mature single woman in her mid-fifties. It would seem that if the relationship between her and Respondent became offensive, that she, by her maturity, education, and training, was in a position to terminate it.

"*Finding:* That the Petitioner has not proved by clear and convincing evidence the allegations contained in 'D' above.

"*Sources:*
"Testimony, Cherry Cedarleaf, T. Vol. 3, pp. 208–217
"Testimony, Cherry Cedarleaf, T. Vol. 4, pp. 3–40
"Testimony, Cherry Cedarleaf, T. Vol. 13, pp. 109–121
"Testimony, John T. McDonough, T. Vol. 12, pp. 83–96

"In respect to 'E' above:

"*Finding:* Referee finds that there was little, if any, testimony relating thereto and the same is found not to have been proved.

"In respect to 'F' above:

"*Finding:* Referee finds that no evidence was presented in regard thereto and therefore the same has not been proved.

"In respect to 'G' above, the evidence shows that from July, 1970 through 1973 that the Respondent did on numerous occasions request certain county officials of Washington County to furnish transportation to Hazelden, located at Center City, Minnesota, and to the Jamestown Foundation. That on some occasions prior to June, 1973 that the Respondent and the party transporting him would stop at taverns in the area and consume intoxicating beverages. The stopping at taverns and consumption of intoxicating beverages occurred prior to June, 1973 and in practically all instances occurred after working hours. The Respondent testified that these trips to Hazelden and Jamestown were work-related which was corroborated by other testimony. There was no clear and convincing proof that they were not. The evidence also disclosed that during this period the Respondent was physically unable to drive a car.

"*Finding:* That the allegation set forth in 'G' above has not been proved by clear and convincing evidence.

"*Sources:*

"Pet. Ex. RR, Bodo Suemnig Statement

"Testimony, Bodo Suemnig, T. Vol. 6, p. 163; T. Vol. 7, pp. 28–29

"Testimony, Robert Vigoren, T. Vol. 7, pp. 38 et seq.

"Testimony, Hulen B. Risenhoover, T. Vol. 6, pp. 21 et seq.

"Testimony, Cherry Cedarleaf, T. Vol. 3, pp. 208–217; T. Vol. 4, pp. 3–39; T. Vol. 13, pp. 107–128

"Testimony, Howard Albertson, T. Vol. 1, pp. 142–151

"Testimony, John T. McDonough, T. Vol. 16, p. 3

"As to allegation 'H' above, Petitioner and Respondent produced evidence as to several distinct and separate incidents which will be referred to by the name of the individual involved.

"1. *James T. Wrich matter.* The evidence discloses that James T. Wrich from and after February 11, 1976 has been the Executive Director of the Minnesota State Alcohol and Drug Authority, Department of Public Welfare, State of Minnesota. The Respondent prepared a written proposal for Chemical Dependency Training for Judges and the same was brought before Mr. Wrich in his capacity as Executive Director. In March, 1976 the Respondent and Lawrence [sic] C. Harmon, then Director of Continuing Education for the State Court Personnel for the Supreme Court of Minnesota, met at the office of Mr. Wrich, at which time the Respondent, in the presence of Mr. Harmon, swore at and verbally abused Mr. Wrich, claiming mismanagement in that the State had in the recent past funded a Drug Education Program (for small amount of marijuana) to be carried out by the Minnesota Behavioral Institute of Anoka, Minnesota; whereas the Respondent's proposed program was not funded. The Respondent explained his conduct on the basis that Mr. Wrich at one time swore at him, which Mr. Wrich had admitted. However, this explanation does not excuse the Respondent for the conduct displayed by him.

"Thereafter, in April, 1976, the Respondent telephoned Mr. Wrich and again used abusive language and cursed Mr. Wrich and threatened to go to the news media (St. Paul paper) in regard to how the State's contract was awarded to the Minnesota Behavioral Institute of Anoka. On January 3, 1977, at the beginning of the legislative session, an article did appear in the St. Paul Dispatch, wherein the Respondent was quoted as saying that the Minnesota Behavioral Institute program was a 'Mickey Mouse program' and that the awarding of such contract had been due to pressure by the Anoka County legislative delegation, which allegation was based on no substantive evidence except possible hearsay.

"*Finding:* The evidence is clear that such vicious attack upon Mr. Wrich was not provoked by Mr. Wrich, was entirely out of keeping with proper decorum in a quasi-judicial activity of the Respondent, and constituted a violation of Canon 2A of the Code of Judicial Conduct.

"*Sources:*

"Pet. Ex. BBB, Application for Grant

"Pet. Ex. CCC, Jan. 3, 1977, St. Paul Dispatch article

"Pet. Ex. GGG, Jan. 4, 1977, McCarron letter to Respondent

"Pet. Ex. HHH, Jan. 5, 1977, Respondent letter to McCarron

"Pet. Ex. III, Jan. 7, 1977, McCarron letter to Respondent

"Pet. Ex. JJJ, Resolution of Anoka County Delegation

"Testimony, James Wrich, T. Vol. 8, pp. 54, 81, 94, 95–96

"Testimony, Lawrence [sic] C. Harmon, T. Vol. 9, pp. 119, 135–138, 143, 162–165

"Testimony, Paul McCarron, T. Vol. 9, pp. 93–106

"Testimony, John T. McDonough, T. Vol. 12, pp. 194–112

"2. *Lawrence [sic] C. Harmon matter.* On September 8, 1976 in response to a letter written to the Respondent by Lawrence [sic] C. Harmon, then Director of Continuing Education for the State Court Personnel of the Supreme Court, which letter was

written in response to an editorial of September 3, 1976 in the St. Paul Dispatch, and allegedly described the proposed Judges Alcohol Training Program to be the 'program of the Respondent', the Respondent telephoned Mr. Harmon and in great anger without allowing Mr. Harmon to speak, read to Mr. Harmon a letter the Respondent had written on September 8, 1976 to Mr. Harmon in response to Mr. Harmon's letter of September 7, 1976. Further, Respondent stated to Mr. Harmon 'that if the Supreme Court withdrew it sponsorship of the Judges Alcohol Training Program, the Respondent would "take the same to the press with the message that the Supreme Court was coddling judges who had alcohol problems." '

"*Finding:* Such conduct constituted a violation of Canon 2A of the Code of Judicial Conduct.

"*Sources:*
"Pet. Ex. QQQ, Sept. 3, 1976, Editorial, St. Paul Dispatch
"Pet. Ex. MMM, Sept. 7, 1976, Harmon letter to Respondent
"Pet. Ex. NNN, Sept. 8, 1976, Respondent's letter to Harmon
"Pet. NNN–1, second page of letter
"Pet. Ex. PPP, Sept. 8, 1976, Editorial, Mpls. Star
"Testimony, Lawrence [sic] C. Harmon, T. Vol. 9, pp. 133–134; 138–139
"Testimony, John T. McDonough, T. Vol. 12; pp. 109–114

"3. *David E. Knefelkamp matter.* In July, 1974, David E. Knefelkamp, then police officer of the City of Stillwater, had obtained a search warrant signed by the Respondent. There is evidence that the search warrant obtained by Knefelkamp was for purposes in addition to the purposes stated therein. Shortly after said search warrant was executed, the Respondent confronted David E. Knefelkamp in the hallway of the old Washington County Courthouse and in front of a number of other persons loudly accused him of improper action in obtaining the search warrant.

"Then in December, 1976, while David E. Knefelkamp was Project Coordinator of the Community Involvement Program of Washington County, Department of Court Services, the Respondent angrily and loudly and in front of a number of other personnel of the Department of Court Services, demanded copies of room receipts and other information pertaining to costs of all persons who attended a particular seminar. The Respondent claimed he was justified in his actions.

"The conduct of the Respondent in relation to David E. Knefelkamp in the matters recited above is not in keeping with judicial decorum in that such reprimands, which may or may not have been justified, *should not have been carried out in a public manner in the presence of other persons.*

"*Finding:* Such conduct constituted a violation of Canon 2A of the Code of Judicial Conduct.

"*Sources:*
"Testimony, David E. Knefelkamp, T. Vol. 6, pp. 73–74; 78–84; 85–91
"Testimony, John T. McDonough, T. Vol. 16, pp. 4–6; T. Vol. 12, pp. 59–62

"4. *Detective Sergeant Risenhoover matter.* It is the claim of the Board that in the fall of 1972 or in the spring of 1973, while drinking with Sergeant Risenhoover of the Washington County Sheriff's Department, that the Respondent threatened to 'screw him up' if Risenhoover didn't keep secret the drinking incident and that subsequently the Respondent made criticism of Risenhoover to the Sheriff of Washington County. The Respondent admitted drinking with Sergeant Risenhoover, but denied making any threats in respect to Risenhoover's position.

"*Finding:* The evidence of improper conduct is not clear and convincing in this matter.

"*Sources:*
"Testimony, Hulen Risenhoover, T. Vol. 6, pp. 33–34; 57
"Testimony, Edward G. Westphal, T. Vol. 6, pp. 10–11
"Testimony, John T. McDonough, T. Vol. 16, pp. 3–4

"5. *Robert Vigoren matter.* It is the claim of the Petitioner that the Respondent in April, 1976 threatened or intimidated Robert Vigoren, a Probation Officer of the C.E.D.A. program with Washington County, by telling him that if he obtained a divorce he would have no job with Washington County. Evidence showed that Mr. Vigoren did get a divorce, but that he was not appointed to a permanent position as a probation officer of Washington County, despite seemingly good qualifications. Mr. Vigoren inferred that because the Respondent opposed his getting a divorce, that this in turn prevented him, Vigoren, from being hired as a full-time probation officer. The Respondent denied such charge. The evidence shows that the hiring of Vigoren as full-time probation officer required the County Board and the majority of country judges to approve such appointment, and in this instance only one of the three county judges of Washington County approved such hiring.

"*Finding:* The evidence is not clear and convincing that the Respondent's not approving Vigoren's application as a full-time probation officer was as a result of Vigoren's getting a divorce over Respondent's objection.

"*Sources:*
"Pet. Ex. QQ, Proposed Adm. Order
"Pet. Ex. RR, Statement of Bodo Suemnig
"Testimony, Robert Vigoren, T. Vol. 7, pp. 49–52; 55; 67–68; 70
"Testimony, Bodo Suemnig, T. Vol. 7, pp. 2–37
"Testimony, John T. McDonough, T. Vol. 14

"6. *David Champion matter.* The Petitioner produced evidence that the Respondent appeared before the County Board of Washington County on September 7, 1976 and while before the Board, and in the presence of other persons, had a confrontation with David Champion, Washington County Coordinator, regarding certain courthouse furniture, and that the Respondent shouted at Champion in a loud voice and flailed his arms and made a spectacle of himself before the Board of County Commissioners; however, Idor Pederson, County Commissioner who was present at such meeting, testified that he remembered the meeting clearly and that the Respondent did not cause a disturbance, make a spectacle of himself, or shout at Mr. Champion, or flail his arms, and the newspaper article which covered said matter was untrue and distorted.

"*Finding:* Referee finds that the evidence is not clear and convincing in respect to Respondent's having improperly conducted himself before the Board of County Commissioners.

"*Sources:*
"Pet. Ex. HHHHH, Sept. 7, 1976, St. Paul Dispatch article
"Pet. Ex. IIIII, Sept. 15, 1976, St. Paul Dispatch article
"Testimony, Idor Pederson, T. Vol. 17, pp. 69–75
"Testimony, John T. McDonough, T. Vol. 15, pp. 39–40
"Testimony, David Champion, T. Vol. 6, pp. 135–137

"The Board alleged in its Complaint:

"*Charge 5:*

"'Respondent has violated Minnesota Statute § 487.03 Subd. 4:

"'"  .   .   . [The] chief county court judge  .   .   . shall be responsible for assigning the work of the [county] court."

"'and Canon 3B (1):

"'"A judge should diligently discharge his administrative responsibility, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials."

"'in the following particulars:

"'A. Respondent did not accept the lawful directive of his Chief Judge and instead did refuse to accept assignment to juvenile and divorce matters.

"'B. Respondent refused to abide by the lawful administrative order of his Chief

Judge to be in his chambers and available and accessible during certain hours and on certain days.

" 'C. Respondent refused to abide by the lawful administrative orders of his Chief Judge in that Respondent refused to prepare and submit weekly calendar schedules.

" 'D. Respondent has been disrespectful to his administrative superior, the Chief County Court Judge of Washington County Court, in that he has insulted him, cursed at him and ordered him out of his chambers while he was attempting to perform his duties as such Chief Judge.

" 'E. Respondent was responsible for administering The Project (described above) but did [fail properly to account for the funds to Minnesota Department of Public Welfare in the application for grant extension] * did administer its account inaccurately and carelessly resulting in failure of The Project to be accredited by the National Commission on Accreditation of Hospitals. [The Respondent failed to disclose to the Chief Judge that The Project had failed to receive accreditation by the Joint Commission on Accreditation of Hospitals.] *'

"The record discloses that Judge Howard Albertson was appointed Chief Judge of the Washington County Court by Order of Chief Justice Sheran dated October 10, 1974, and was reappointed as Chief Judge of County Court of Washington County in October, 1976, and served as Chief Judge of the County Court of Washington County until the Court Reorganization Act went into effect July 1, 1977. As Chief Judge, Judge Albertson had administrative authority of the Washington County Court, including the responsibility for the assigning of the work of the court.

"As Chief Judge of Washington County, Judge Albertson issued Administrative Orders for 1975, 1976, and 1977, all of which related to assignments and duties of the

three judges of Washington County Court. As part of the order of 1975, 1976 and 1977, there was established a 'Judge of the Day' assignment. The 'Judge of the Day' assignment imposed the duty on the judge so assigned to be present from 9 A.M. to 12 Noon, and from 1:30 P.M. to 4:30 P.M. for the handling of ex parte matters, the issuing of search warrants, the issuing of warrants of arrest, etc. In examination of all the testimony in respect to 'A' above, it appears that the Respondent did on certain occasions request different assignments than those made by the Order of the Chief Judge; however, the record is absent of any concrete evidence of absolute refusal to accept an assignment to hear juvenile or divorce matters, except in such cases where he felt he was disqualified.

"Finding: Referee finds that 'A' above is not proven by clear and convincing evidence.

"In respect to 'B' above the evidence shows clearly that on certain occasions the Respondent did fail to be present at the Washington County Courthouse on his assignment as 'Judge of the Day' from 9 A.M. to 12 Noon, and from 1:30 P.M. to 4:30 P.M.

"The Respondent admitted that on certain occasions he left the Courthouse on days when he was assigned the duties as 'Judge of the Day' prior to 4:30 P.M. In defense of his action, he testified that on such occasions he did notify the Clerk of Court and the County Attorney where he could be found and was always available on call if an emergency situation arose calling for action by the 'Judge of the Day'. The testimony of the Respondent was corroborated by the Clerk of Court and witnesses from the County Attorney's office. The Respondent did fail to advise Chief Judge Albertson on most occasions when he would not be present at the courthouse. Technically, on certain days Respondent was in violation of exact terms of the 'Judge of the Day' assignment.

* As amended

"*Finding:* Respondent's conduct constituted a technical violation of Canon 3B (1) of the Code of Judicial Conduct.

"*Sources as to 'A' and 'B':*

"Pet. Ex. D, Oct. 10, 1974, J. Sheran's Order Appointing J. Albertson as Chief Judge

"Pet. Ex. F, Dec. 20, 1974, J. Albertson's Adm. Order

"Pet. Ex. G, Jan. 12, 1976, J. Albertson's Adm. Order

"Pet. Ex. H, Nov. 5, 1976, J. Albertson's Adm. Order

"Pet. Ex. I, J. Sheran's letter to Respondent, Jan. 10, 1976

"Testimony, Howard Albertson, T. Vol. 1, pp. 129; 166–172; T. Vol. 2, pp. 55; 140–148

"Testimony, John T. McDonough, T. Vol. 14, pp. 71–72; T. Vol. 19, pp. 152–153

"Testimony, Sonya Linde, T. Vol. 20, pp. 34–35

"Testimony, Alice Nielsen, T. Vol. 19, pp. 101–104

"Testimony, Sharon Pauley, T. Vol. 19, pp. 152–153

"Testimony, Sharon Shelton, T. Vol. 19, pp. 74–75

"Testimony, Elizabeth Hill, T. Vol. 16, pp. 103–104

"As to 'C' above, by Administrative Memorandum of October 31, 1974 (Pet. Ex. E) and by Administrative Order 2–76 (Pet. Ex. G) and Administrative Order 1–77 (Pet. Ex. H) issued by Chief Judge Albertson, each of the County Judges was required to file a weekly and monthly calendar on forms that were attached to memorandum of October 31, 1974. The evidence is clear that on numerous occasions the Respondent failed to file both weekly and monthly calendars. In response to this allegation, the Respondent produced evidence that such weekly and monthly calendars were kept by the Court Reporter or Clerks of Court and therefore it was duplication and unnecessary for him to file such report with the Chief Judge. The evidence disclosed that in truth and in fact, calendars were prepared by the Court Reporter and Clerks of Court, but that such calendars were not on the form nor did they contain all of the information that was required by Chief Judge Albertson's order. It would have been a simple matter for the Respondent to have the personnel whom he stated kept such records, complete the form as required in the Administrative Order and file the same with the Chief Judge.

"*Finding:* Referee finds that the Respondent did frequently fail to prepare and submit weekly and monthly calendar schedules and reports as required by Administrative Order of Chief Judge Albertson from October 31, 1974 through July 1, 1977, which constitutes a violation of Canon 3B (1) of the Code of Judicial Conduct.

"*Sources:*

"Pet. Ex. E, Oct. 31, 1974, Memorandum Order of Albertson

"Pet. Ex. F, Dec. 20, 1974, J. Albertson's Adm. Order

"Pet. Ex. G, Jan. 12, 1976, J. Albertson's Adm. Order

"Pet. Ex. H, Nov. 5, 1976, J. Albertson's Adm. Order

"Testimony, Howard Albertson, T. Vol. 1, pp. 137–138; 148–157; 161–167

"Testimony, John T. McDonough, T. Vol. 14, pp. 50–65

"Testimony, Sharon Shelton, T. Vol. 19, pp. 71–77

"Testimony, Alice Nielsen, T. Vol. 19, p. 107

"Testimony, Margaret Casanova, T. Vol. 19, pp. 122–123

"Testimony, Elizabeth Hill, T. Vol. 16, pp. 99–101

"In respect to 'D' above, the evidence shows that the relationship between the Respondent and Chief Judge Albertson became strained in the fall of 1974. That there were frequent arguments in regard to the assignments made by the Chief Judge, and in particular in 1974 during one of such arguments the Respondent stated to Chief Judge Albertson: 'You have been on the bench 20 minutes and I have been on for 20 years and as I have seniority you are going to do what I tell you.'

"That on September 24, 1976 the Respondent came to Judge Albertson's office and

demanded to have a conference with him even though Judge Albertson was at the time in private conference with other persons. That Judge Albertson requested the Respondent to wait until he completed his conference with the people with whom he was involved, and then the Respondent became angry and made a handwritten note to Judge Albertson: 'If I receive one more ridiculous letter like the one this afternoon I am taking you to the Judicial Responsibility Committee on the following grounds. 1. Your failure . . . .' He then put down the note pad on which he had written and dictated a memo to Judge Albertson's court reporter, which, among other things, indicated again that he, the Respondent, was 'taking Judge Albertson to the Judicial Responsibility Committee' and stated his reason.

"*Sources:*
"Pet. Ex. D, Oct. 10, 1974, Order Appointing Albertson as Chief Judge
"Pet. Ex. N, Sept. 24, 1976, Albertson Memorandum to Sandeen and Respondent.
"Pet. Ex. N–1, Sept. 24, 1976, Respondent's Memorandum to Judge Albertson
"Pet. Ex. N–2, Sept. 24, 1976, Respondent's Memorandum
"Pet. Ex. O, Sept. 24, 1976, Respondent's Memorandum to Judges Sandeen and Albertson
"Testimony, Robert J. Monson, T. Vol. 1, pp. 78–81
"Testimony, Howard Albertson, T. Vol. 1, pp. 144–148
"Testimony, John T. McDonough, T. Vol. 14, pp. 31–48; 64

"That on or about August 11, 1976 the Respondent met with Patrick Griffin, Coordinator of Chemical Dependency Division, Washington County Human Services, and Rollis R. Odendahl, Supervisor, Office of Drivers Training, Minnesota Department of Public Safety, in respect to the qualifications of 'The Project' as a presentence investigation tool and how the same would comply with M.S.A. 169.126. Judge Albertson entered the chambers of the Respondent to discuss this problem, and after a

short time the Respondent in a loud and angry voice, in the presence of others, ordered Chief Judge Albertson from the Respondent's chambers. That Judge Albertson returned to the Respondent's chambers and again attempted to carry on a rational discussion of the problem, and the Respondent again in a loud and angry voice ordered him to 'Get out.' The Respondent admitted he ordered Judge Albertson from his chambers.

"*Sources:*
"Testimony, Howard Albertson, T. Vol. 1, pp. 179–186
"Testimony, Rollis Odendahl, T. Vol. 3, pp. 70–78; 81–82
"Testimony, Patrick Griffin, T. Vol. 3, pp. 127–131
"Testimony, John T. McDonough, T. Vol. 14, pp. 153–156
"Testimony, Howard Albertson, T. Vol. 2, pp. 2–9

"There were numerous other confrontations between Chief Judge Albertson and the Respondent in which the Respondent showed utter disregard and disrespect for Judge Albertson. Respondent on December 6, 1976 sent a letter to Judge Albertson with copies to Judge Sandeen; the Washington County Commissioners; David Champion, County Coordinator; Stanley Keeley, Director of Washington County Human Services; Robert Kelly, Washington County Attorney; James Wrich, Minnesota Department of Public Welfare. This letter was in response to Judge Albertson's letter of December 3 in which Judge Albertson stated that 'The Project' had been rejected for accreditation by the Joint Commission on Accreditation of Hospitals and requested information relating to the Joint Committee on Accreditation of Hospitals' study that was made of 'The Project'. In his letter the Respondent stated, among other things, that a public meeting would be held at which 'you and who ever gives you advice will be the issues of that program.' The letter further stated, 'This will acknowledge receipt of your usual and weekly

Friday afternoon letter which contains, again, as usual, misrepresentations of fact, false assumptions, and a gross manifestation of ignorance as to what accreditation for the Joint Commission on Accreditation of Hospitals AIF is all about . . . . Most certainly then, all your questions will be answered in detail and, who knows, you might receive a meaningful educational experience which your ignorance of your own ignorance concerning alcoholism programs in Washington County seems to demand.'

"*Sources:*

"Testimony, Howard Albertson, T. Vol. 2, pp. 44–46

"Pet. Ex. T, Dec. 3, 1976, Albertson letter to Respondent

"Pet. Ex. U, Dec. 6, 1976, Respondent's letter to Albertson

"*Finding:* That Respondent's conduct in respect to his administrative superior did constitute violation of Canon 3B (1) in that it shows by clear and convincing evidence conduct which failed to facilitate the performance of the administrative responsibilities of court officials.

"In respect to 'E' above, it is the claim of the Petitioner that the Respondent in November, 1975, as administrative judge for 'The Project', requested an extension of the grant to extend the same to November 21, 1976. In such request the Respondent stated that there was an unexpended balance of funds on hand in 'The Project' of $41,734.13 as of November 21, 1975; whereas an audit of 'The Project' which was conducted by Alfred M. Helling of the State Department of Public Welfare in December, 1976 revealed that in December, 1975 when Respondent's request for extension was approved, the unexpended grant funds on hand were actually $83,277.94 and further in a letter to the Department of Public Welfare on August 3, 1976, Respondent requested a transfer of certain funds of 'The Project' from the administrative to the program account and stated that 'The Project' had unexpended balance of grant funds as of June 30, 1976 of $10,683.01; whereas the

audit of the Department of Public Welfare revealed that as of June 30, 1976 there was actually $76,488.47 in 'The Project' account. There is absolutely no claim that the Respondent explained the discrepancy that appears above on the basis that the amount of money which was in the account of 'The Project' which had its sources from tuition paid by those assigned to 'The Project' was not intended or required to be included in the application for grant extension or in an application for transfer of funds from the administrative to program account. An examination of Petitioner's Exhibit VV indicates that the Respondent did not attempt to hide the income received from studnets [sic] assigned to 'The Project'. On page 3 thereof it sets forth the budget as approved on the original grant totaling $84,500.00. This is followed by expenditures during the reported period followed by a balance on unexpended amounts. A cursory examination of these figures would make it obvious to anyone examining the application that it did not include income from students. Further, on page 5 thereof, paragraph 2, it is stated as follows:

" 'The Project cost per student during the first years was $150.00. The cost per student will be reduced commencing February 26, 1976 to $100.00 and hopefully, in June 1976 to $75.00 per student.'

and further in paragraph 3, page 5:

" 'It is projected that the $100.00 and then $75.00 cost per student will be sufficient to maintain and pay the entire cost of the program as to both administrative and program personnel, office supplies, stationery, forms, literature and films.'

On page 1 of such Exhibit in paragraph 3, the Respondent states: '. . . only 270 students were assigned to The Project.' Upon considering the above quotations from the Petitioner's Exhibit VV, the authorities at the Chemical Dependency Division, State Alcohol and Drug Authority, should have been fully aware that the income from students was not included, and if it were their position that it should have

been included, they should have made a direct request for such information.

"There was disagreement between the Department of Public Welfare and the Respondent as to the proper accounting procedure, which led to a letter dated August 24, 1976 to the Respondent from Mr. Kenneth M. Steger, of the State Department of Public Welfare, in which it was demanded that the unused funds be returned immediately to the Department of Public Welfare. The Respondent answered Mr. Steger's letter on August 26, 1976 and referred to the request for return of money, to be 'arbitrary and capricious' and made no order for return of money, indicating that the final determination of the issue 'would have to be settled in the appropriate court.' Other letters were exchanged between the Respondent and the Department and no agreement was reached between the Respondent and the Department as to the return of money or proper accounting procedure. The County Attorney of Washington County, Robert W. Kelley, on June 6, 1977 in a letter to the Honorable Milton D. Mason Judge of District Court (who was assigned by the Supreme Court to attempt to arbitrate problems of Washington County Court) indicated that from the audit by Mr. Feuerpfeil, Financial Grants Coordinator of Washington County, that 'The Project' owed the Department of Public Welfare approximately $2,500.00, copy of which letter was sent to Chief Justice Sheran, Judge Albertson, Judge McDonough, Judge Sandeen, the Attorney General's office, and Fred C. Feuerpfeil. No action has been taken on this matter by the Attorney General's office and negotiation [sic] have been going between Mr. Feuerpfeil and the Department of Public Welfare in an effort to get the matter settled.

"*Finding:* The evidence does not support by clear and convincing evidence the charge that the Respondent failed properly to account for the funds of 'The Project' to the Minnesota Department of Public Welfare in the application for grant extension or in

failure to return funds to the Minnesota Department of Public Welfare.

"*Sources:*

"Pet. Ex. SS, DPW, Helling Audit File

"Pet. Ex. TT, DPW, Helling Audit Worksheet

"Pet. Ex. Q, Dec. 21, 1976 Wrich letter to Albertson

"Pet. Ex. VV, Sept. 31, [sic] 1975, Application for Extension

"Pet. Ex. YY, Aug. 24, 1976, Steger letter to Respondent

"Pet. Ex. XX, Aug. 3, 1976, Respondent letter to Steger

"Pet. Ex. ZZ, Aug. 26, 1976, Respondent letter to Steger

"Resp. Ex. 1, June 6, 1977, Kelly letter to Mason

"Testimony, Fred M. Helling, T. Vol. 8, pp. 5–33; 50–53

"Testimony, James T. Wrich, T. Vol. 8, pp. 68; 72–73; 145

"Testimony, John T. McDonough, T. Vol. 8, pp. 38–50; T. Vol. 14, 15, 19, 20

"Testimony, Kenneth M. Steger, T. Vol. 22, pp. 60–62

"As to the amended allegation in the Complaint that Respondent failed to notify Chief Judge Albertson that 'The Project' had not been accredited by Joint Commission on Accreditation of Hospitals, the evidence discloses that the official letter in respect to the accreditation of 'The Project' was dated December 17, 1976, addressed to Ms. Jan Hawthorne, Chief Administrative Officer, Washington County Alcohol/Drug Survival Project, Washington County Courthouse, Stillwater, Minnesota, with a copy of the same going to the Respondent. It appears that Judge Albertson knew 'The Project' was not accredited on December 3, 1976, for he states in a letter to the Respondent dated December 3, 1976:

"'*Are you aware, that the Washington County Drug and Survival Project (The Project) has been rejected for accreditation by the J.C.A.H.*'

Thus it would appear that the Respondent's letter to Judge Albertson dated December 6, 1976 in which he states:

**674**

" 'The process of accreditation is still in progress. The Project has not been rejected.' was a correct official statement of the situation on December 6, 1976.

"The evidence shows that 'The Project' had contracted with Hazelden Foundation as consultant for accreditation. It appears that the reason for non-accreditation was lack of students' physical histories, environmental studies, and post follow-up, none of which was the direct responsibility of the Respondent. The non-accreditation did not infer a deficiency on the other aspects of 'The Project' which according to the surveys made by the J.C.A.H. showed very high comparative scores.

"*Finding:* The record does not establish by clear and convincing evidence that the Respondent failed to disclose to the Chief Judge that 'The Project' had failed to receive accreditation by the J.C.A.H.

"*Sources:*

Pet. Ex. O, Sept. 24, 1976, Respondent Memo to Sandeen and Albertson

"Pet. Ex. W, Nov. 15, 1976, Albertson letter to Respondent

"Pet. Ex. W–1, Respondent letter to Albertson, Nov. 16, 1976

"Pet. Ex. T, Dec. 3, 1976, Albertson letter to Respondent

"Pet. Ex. U, Dec. 6, 1976, Respondent letter to Albertson

"Pet. Ex. V, Feb. 11, 1977, JCAH letter to Albertson, with results of JCAH survey;

"Pet. Ex. V, Dec. 17, 1976, letter JCAH to Hawthorne

"Testimony, James T. Wrich, T. Vol. 8, pp. 106; 139

"Testimony, Kenneth M. Steger, T. Vol. 22, pp. 60–62

"Testimony, John T. McDonough, T. Vol. 14, p. 158

"Testimony, Howard Albertson, T. Vol. 2, pp. 55–63

"The Board alleges in paragraph 6 of its Complaint:

" 'Respondent engaged in conduct prejudicial to the administration of justice which brings the judicial office into disrepute within the meaning of Minnesota Statute § 490.16 and Canons [Canon] 3A (3) and (4) by inappropriate and prejudicial behavior during the course of trials and proceedings before him including particularly rude, discourteous and abrupt conduct toward parties, witnesses and lawyers.'

Pursuant to the allegation contained in paragraph 6 above, the Petitioner introduced evidence in respect to fourteen separate incidents which will be referred to hereinafter by name of the party involved.

"1. *Arvid D. Dixen.* It should be noted that the Dixen matter was the subject of the first formal complaint as against the Respondent. The evidence discloses that on or about May 17, 1974, Arvid D. Dixen, a minister, had intended to be a witness in a divorce proceeding (*Glasspoole v. Glasspoole*) and that he appeared at the Washington County Courthouse on said date and learned that he was not to be a witness and therefore remained in the hallway or corridor. Mr. Dixen testified that after the hearing had been completed and he had been advised of the decision of Judge McDonough, Judge McDonough appeared in the hallway and Mr. Dixen asked him to explain the visitation rights that the father of the children would have, at which time the Respondent shouted and screamed at him, belittled his education, threatened him with contempt, and told an un-uniformed police officer to 'lock him up or take him away'. The Respondent denied the matters contained in the Dixen testimony. A Reverend Haberman, who was with the Respondent in the corridor and witnessed the exchange between Respondent and Mr. Dixen, testified that the Respondent did not abuse Mr. Dixen in any way, nor did he holler or shout at Mr. Dixen, and that in fact Mr. Dixen abused the Respondent. James F. Lammers, attorney for Mrs. Glasspoole, for whom Dixen had intended to testify, did not corroborate Mr. Dixen's allegations, but rather indicated that the Respondent handled the situation very well under the circumstances.

*"Finding:* Referee finds that proof of misconduct of the Respondent in the Dixen matter was not shown by clear and convincing evidence.

"*Sources:*

"Testimony, Arvid D. Dixen, T. Vol. 1, pp. 7–63

"Testimony, John T. McDonough, T. Vol. 14, pp. 92–98

"Testimony, Dwight Haberman, T. Vol. 14, pp. 110–113

"Testimony, James F. Lammers, T. Vol. 14, pp. 118–124

"2. *Terry Smith—A. T. Gearman.* The evidence discloses that in late 1974 and 1975 an issue arose in Respondent's court in respect to the amount of money that A. T. Gearman was to pay for the care of his son who had been processed through juvenile court and placed at Woodland Hills, Duluth, Mn. Mr. Gearman had paid or was willing to pay $60 per month as requested by the Washington County Welfare Department, plus he voluntarily agreed to pay an additional $240 per month, making a total of $300. The Respondent took the position that the law required Gearman to pay the full and entire costs. In this particular matter Mr. Gearman was represented by Attorney Terry Smith. The matter was set for hearing. The Respondent made an order dated December 23, 1974 requiring Mr. A. T. Gearman to submit to the Washington County Welfare Department his income tax returns for the years 1972 and 1973 and a statement of assets and liabilities, on or before January 20, 1975. It was further ordered by the Respondent that Washington County Welfare Department report to the court their determination and explanation of how they arrived at the contribution made by the parents of Thomas Arvid Gearman, who was under commitment to the Washington County Welfare Department for placement at Woodland Hills. Evidence shows that an affidavit of prejudice was filed by Mr. Gearman against the Respondent on or about February 7, 1975. On February 12, 1975 Attorney Terry Smith appeared in Washington County Court before the Respondent in chambers in connection with the hearing which was to be held

in the matter. Mr. Smith testified that the Respondent told him that he would not honor the affidavit of prejudice but would transfer the case to another particular judge whom the Respondent had in mind; that the Respondent had written the statute at issue and knew what it meant and that it did not mean that a man of Mr. Gearman's means could avoid the full cost of his son's care. That further, the Respondent stated that when the matter did come up for hearing, the Respondent's friends from the press would be in the courtroom so there would be full coverage of the matter. Mr. Smith testified that the Respondent refused to have a court reporter present to record this conversation and informed the assistant county attorney, who was also present in chambers, that he would help him prepare the case against Mr. Gearman. Attorney Smith informed his client, Mr. Gearman what had transpired, and Mr. Gearman, in order to avoid publicity in respect to himself and his family, decided to pay the bill in total. The testimony of attorney Smith is corroborated by Pet. Ex. FF, letter written to the Respondent by Mr. Gearman on February 14, 1975, and the testimony of Mr. Gearman. There is further corroboration in the Respondent's reply to Mr. Gearman by letter of February 19, 1975 (Pet. Ex. GG) in which there is no outright denial that the Respondent had threatened the use of the press in the event the matter was tried, but further, there is absolute corroboration in the last paragraph of Pet. Ex. GG that he had lost his temper with attorney Smith:

" 'I regret very much my loss of temper to your attorney. Even though judges should be permitted a manifestation of feeling occasionally, it was reprehensible for me to lose my temper.'

There was an attempt by the Respondent to show that he was right in his decision as to the amount Mr. Gearman should pay; however, the issue *was not who was legally right or wrong* in this matter, but rather, whether or not the conduct of the Respondent was proper in respect to the parties involved.

"*Finding:* Referee finds that the conduct of the Respondent as outlined above would evidence conduct prejudicial to the administration of justice which brings the judicial office into disrepute in violation of Canons [Canon] 3A(3) and (4).

"*Sources:*

"Pet. Ex. HH, Afft. of Prejudice, Feb. 7, 1975

"Pet. Ex. II, Notice of Review re Gearman, Jan. 28, 1975

"Pet. Ex. FF, Gearman letter to Respondent, Feb. 14, 1975

"Pet. Ex. GG, Respondent's letter to Gearman, Feb. 19, 1975

"Testimony, Terry Smith, T. Vol. 4, pp. 46–66; 73–75

"Testimony, A. T. Gearman, T. Vol. 3, pp. 35–69

"Testimony, John T. McDonough, T. Vol. 15, pp. 55–68

"3. *Warren Fillmore:* On or about March 25, 1976 one Warren Fillmore a property claims supervisor of State Farm Mutual Insurance Company, accompanied his insured, one Thomas Goleenbaer, to Conciliation Court. Mr. Goleenbaer had been sued in Conciliation Court by a Mr. Johnson, which suit arose out of a collision between the Goleenbaer and Johnson vehicles. Fillmore accompanied his insured as a witness to testify as to the damage to the Johnson vehicle, he having taken several pictures of the same and obtained statements as to the value of the vehicle from various dealers. After Fillmore and his insured were sworn as witnesses, the Respondent asked Fillmore's name and Fillmore informed him of his name and the fact that he was employed by State Farm Insurance Company; whereupon the Respondent said, 'Get out of my court', and further stated that he did not allow insurance people in his courtroom. As a result no testimony was then given in respect to the amount of damages to the Johnson car on behalf of Goleenbaer. The Respondent in this testimony basically corroborated the testimony of Fillmore in that he stated that it was his practice not to allow any insurance adjusters in Conciliation Court.

"*Finding:* Mr. Fillmore was not a lawyer and appeared as a proposed witness and in no other capacity. The refusal of the Respondent to allow him to testify as to matters that might be relevant constitutes conduct prejudicial to the administration of justice and brings the judicial office in disrepute in violation of Canon 3A (3) and (4).

"*Sources:*

"Testimony, Warren Fillmore, T. Vol. 4, pp. 117–126

"Testimony, John T. McDonough, T. Vol. 15, pp. 75–76

"4. *Allen Stevens—Giovannini-Honda matter.* The Petitioner produced evidence that the Respondent borrowed $500 from the Northwestern State Bank of Stillwater in 1974, last payment of which was due February 1975, and that Mr. Allen R. Stevens, manager of the installment loan department, made several attempts to collect this money, and on or about July 24, 1975 when the last installment was not paid, he contacted the Respondent again, and Respondent became quite irate but that the Respondent did make the final payment July 28, 1975. The Petitioner also introduced evidence that the next contact Mr. Stevens had with Respondent was May 20, 1976 when Mr. Stevens appeared on behalf of the Northwestern State Bank of Stillwater in a case entitled Giovannini vs. Stillwater Honda and Northwestern State Bank of Stillwater. In this action, plaintiff Giovannini was suing Stillwater Honda and Northwestern State Bank, who was the assignee of the conditional sales contract, for alleged unnecessary repairs made by Stillwater Honda to a repossessed motorcycle belonging to Giovannini. In this particular action the Respondent issued a decision dismissing Stillwater Honda as being the wrong party defendant, and ordered judgment against Northwestern State Bank of Stillwater. The Respondent's decision in this matter is under appeal by the Northwestern State Bank of Stillwater. The inference intended by Petitioner herein would be that Mr. Stevens's attempt to collect a debt owed Northwestern State Bank of Stillwater from the Respondent caused the Respon-

dent to make a biased decision in the case hereinabove referred to. The Respondent in turn denied the claim of Stevens that he did not give Stevens a chance to be heard and denied that any prior contact with Mr. Stevens influenced his decision.

"*Finding:* The Referee finds that the claim of the Petitioner in this respect has not been proved by clear and convincing evidence.

"*Sources:*

"Testimony, Allen R. Stevens, T. Vol. 11, pp. 134 et seq.

"Testimony, John T. McDonough, T. Vol. 16, pp. 67–72; T. Vol. 15, pp. 96–97

"5. *Lentz matter.* An inebriety petition had been filed against Mr. Willmar Lentz by his wife in December 1976. Mr. Lentz was taken into custody and brought before the Respondent for processing. It was the testimony of Mr. Lentz that the Respondent forced him into alcohol treatment by assigning him to 'The Project'. The testimony revealed that Lentz was represented at such hearing by attorney Lyle Eckberg, and that after a discussion of the matter with his attorney, and his attorney discussing the matter with the Respondent, Lentz voluntarily signed an agreement whereby he would attend 'The Project'. Lentz claimed he signed this agreement because 'his back was against the wall' and 'I didn't know if I had any rights left up to the way it went up until then.' Respondent denied any abuse or mistreatment of Lentz in his testimony, and attorney Lyle Eckberg, who represented Lentz, testified that the Respondent handled this case just like any other case. He discussed the matter with both parties and with the attorney, and there was nothing unusual that he recalled that happened in this respect. Mr. Lentz had testified that he thought he got a 'railroad job'; however, his attorney, Lyle Eckberg, testified that he did not get a 'railroad job' and that the judge was very compassionate and understanding and does understand people with alcohol problems when they are brought into his court, and that the Lentz case was handled in such manner.

"*Finding:* Referee finds that the Petitioner has failed to prove by clear and convincing evidence any misconduct on the part of the Respondent in the Lentz matter.

"*Sources:*

"Testimony, Lyle Eckberg, T. Vol. 17, pp. 15–16

"Testimony, Willmar Lentz, T. Vol. 7, pp. 71–130

"Testimony, John T. McDonough, T. Vol. 16, pp. 22–28

"Resp. Ex. 22, Transcript Lentz hearing

"6. *Ciresi matter—Guardianship of Freda Norris.* During the year 1976 Mr. Jerome Ciresi was attorney for one Berta Metz, who was a companion and provided nursing service for one Freda Norris, an aged woman. Freda Norris was a resident of Washington County and had a special guardian of her estate (William and Clarence Springborn). On behalf of Berta Metz, Jerome Ciresi attempted to file a petition for general guardianship. On or about the same time, Mr. Lyle Eckberg, who was attorney for the special guardians, had filed a petition that the special guardians (relatives) be appointed general guardians. It was the testimony of Mr. Ciresi that the Respondent refused to allow him to file the petition of Berta Metz for general guardianship of Freda Norris, and then Mr. Ciresi, as attorney for Berta Metz, filed an objection to the appointment of the special guardians to be general guardians. In August, 1976, Mr. Ciresi appeared with his client before the Respondent in a duly scheduled hearing for the appointment of the special guardian as general guardians. Mr. Ciresi testified that the Respondent refused to allow any evidence whatsoever on behalf of his client, who objected to such appointment. The court ruled that the law did not sustain Ciresi's filing of petition for guardianship in that Berta Metz was neither an heir nor did she have pecuniary interest as provided by law, to intervene in this matter. The special guardians, William and Clarence Springborn, were appointed general guardians by order of the Respondent. This decision was appealed by Mr. Ciresi to Washington County District Court, which court sustained the Respondent, and

Mr. Ciresi's appeal was also refused by the Supreme Court of the State of Minnesota. The testimony of attorney Lyle Eckberg, who was the opposing attorney, to some extent corroborated the testimony of Mr. Ciresi in that Mr. Eckberg testified that Mr. Ciresi wanted the court to hear some evidence and that the Respondent refused to allow him to submit such evidence. Mr. Eckberg also testified that Mr. Ciresi and the Respondent entered into a heated argument. There was testimony by the court reporter that nothing unusual occurred in the Norris matter, which was corroborated by the testimony of Bailiff Steven Scattum and by Richard D. Becker of the Sheriff's Department. The appeal taken in this matter consisted of Writ of Prohibition taking up the issues of the Respondent not allowing attorney Ciresi to file his petition, and the Respondent's failure to hear Ciresi's evidence in opposition to Springborns being appointed general guardians of Mrs. Norris. Thus it would appear that the same issues were determined adversely to Mr. Ciresi by the District Court of Washington County and the Supreme Court as were brought up by Mr. Ciresi in his testimony in the instant hearing.

"*Finding:* The Referee finds that Petitioner has failed to prove by clear and convincing evidence that the Respondent's conduct in the above matter was prejudicial to the administration of justice which brings the judicial office into disrepute in violation of Canon 3A (3) and (4).

"*Sources:*

"Testimony, Elizabeth Hill, T. Vol. 16, pp. 125–126

"Testimony, Steven Scattum, T. Vol. 20, pp. 50–51

"Testimony, Richard D. Becker, T. Vol. 20, pp. 40–46

"Testimony, John T. McDonough, T. Vol. 16, pp. 48–49

"Testimony, Jerome Ciresi, T. Vol. 9, pp. 71–77

"Testimony, Lyle Eckberg, T. Vol. 5, pp. 137–139

"7. *Robert J. Monson, Attorney—Fritz vs. Fritz.* The record shows that on August 8, 1973 the Respondent presided at a hearing on counter-motion for temporary alimony, support and custody. At such hearing Mr. Robert J. Monson appeared on behalf of Mrs. Fritz, and Mr. Kenneth Griswold appeared on behalf of Mr. Fritz. Both Mr. and Mrs. Fritz were present at such hearing. Affidavits were prepared by the attorneys for each party relating to the issues of custody, support and alimony. In his affidavit Mr. Fritz raised the question of alcoholism on the part of Mrs. Fritz. There were counter-affidavits of the children and others relating to the question of Mrs. Fritz' alcoholic addiction. In particular, one of the sons had recanted an affidavit he had made earlier on behalf of Mr. Fritz that his mother was an alcoholic. The Respondent first discussed the matter in chambers with the attorneys and later the parties were brought into chambers and according to Mr. Monson, the attorneys were asked by the Respondent not to make any comment during the course of his examination of the parties. Mr. Monson's testimony would indicate that the Respondent spent much of the time going into the question of the possible alcoholism of Mrs. Fritz, and at one point told Mrs. Fritz that she could not have the children if she did not go to Hazelden to be treated for alcoholism. Mr. Monson also testified that at one point the Respondent accused Monson of forcing the boy who had made the recanting affidavit into making such affidavit. This testimony was never directly denied. Mr. Monson also testified that the Respondent shouted and hollered at him when he argued that the matter before the court was not a question of alcoholism, but rather a question of temporary custody, temporary alimony, and temporary support. Mr. Monson, upon his return to his office, dictated a memorandum of what transpired, which memorandum is dated August 9, 1973 and marked Pet. Ex. 'C', which corroborates his testimony. The Respondent denied some of the accusations of Mr. Monson and stated that he only suggested that it would be well, if Mrs. Fritz were in doubt whether she had an alcoholic problem, that she could have the same determined at Hazelden but that he

did not in any way threaten commitment to Hazelden or make a statement that she would be denied custody if she did not go to Hazelden. Attorney Griswold testified that there was no misconduct on the part of the Respondent. Mr. Griswold's memory was somewhat hazy, but he did corroborate to some extent Mr. Monson's testimony in respect to the Respondent dwelling on Mrs. Fritz's alcohol problem and the benefits of Hazelden. The matter was terminated by the court dictating an order into the record, which, among other things, provided that both Mr. and Mrs. Fritz would remain in the homestead, that Mr. Fritz would provide his wife with the same amount of support she was accustomed to, and that the custody would remain the same, that the matter would be set down for trial, and that there would be reservations in regard to temporary alimony.

"*Finding:* Based upon a careful analysis of all the testimony and the exhibits, Referee finds that it was proven by clear and convincing evidence that there was misconduct by the Respondent in accusing Mr. Monson of coercing an individual to make a false affidavit, in violation of Canon 3A (3) and (4).

"*Sources:*
"Pet. Ex. C, Aug. 9, 1973, Monson Memorandum
"Resp. Ex. 85, Court File, Fritz vs. Fritz
"Testimony, Robert J. Monson, T. Vol. 1, pp. 65–105
"Testimony, Kenneth Griswold, T. Vol. 21, pp. 163–189
"Testimony, John T. McDonough, T. Vol. 15, pp. 26–34

"8. *Moosbrugger—Clark Oil and Refining Corporation vs. Koepp.* The evidence discloses that the plaintiff in the above-entitled action was represented by attorney Richard M. Arney, and that the defendant was represented by attorney Gordon C. Moosbrugger. The case was set for 3 P.M. on January 29, 1975. Attorney Moosbrugger was not present when the case was called at 3 P.M. and did not arrive until 3:08 P.M. The Respondent proceeded to hear the case in Moosbrugger's absence and testimony was taken prior to Moosbrugger's arrival. Mr. Moosbrugger had been delayed by inclement weather. A transcript of the proceedings was introduced in evidence, being Resp. Ex. 7. The transcript on page 27 reveals that Mr. Arney requested the court's permission for a moment to confer with one of his witnesses, which permission was granted by the court. The court then, without hearing any of the defendant's witnesses, made the following statement in open court:

"'As to the negligence of the defendant, Bradley Koepp, it is vicarious and absolute. Mr. Moosbrugger, your objections are childish and ridiculous, and quite immature. We are trying to come to some reasonable definition of the case.

"'Number one, you stated to the court it was settled; it was false; it was not settled. At a pre-trial conference it was reset for today and you are not here on time.

"'Your client is not being adequately represented. If you cannot come to any reasonable settlement of this we will find damages, this is on the record, based on what we have here so far this afternoon.

"'Mr. Moosbrugger: May it please the Court, may the record show that at 3:27

. . . . .

"'Your Honor, I ask that this entire proceeding be placed on the record.

"'The Court: It is on the record. If we hear much more from you I will hold you in contempt. Do you hear me?

"'Mr. Moosbrugger: Your Honor . . . .

"'The Court: You misrepresented to the Court once that this was settled, and it wasn't. You did that on January 22nd.

"'Mr. Moosbrugger: That is simply not true. Your Honor has falsely accused counsel.

"'The Court: You weren't in Court here. This is the second time you failed to appear.

"'Mr. Moosbrugger: I beg your pardon, Your Honor.

"'The Court: You also failed to appear on January 22nd.

" 'Mr. Moosbrugger: Your Honor, I want to point out I am ordering a copy of this transcript. I intend to take it to the Supreme Court.

" 'The Court: This Court will adjourn. We will set this for another time. In the meantime, prepare it. Get this on the record. We are the ones who will be writing to the Bar Association.

" 'Mr. Moosbrugger: I want a copy of the record.

" 'The Court: That is enough. Do not make one more remark in this court room.'

Mr. Moosbrugger testified that not all of the caustic remarks directed to him are in the record and that the court directed the reporter not to place such in the record. Be that as it may, it is quite clear from the record we have before us that the Respondent's conduct and statements were not in keeping with good judicial decorum. It must be noted that the remarks of the Court hereinbefore quoted were made in open court in front of the parties, the witnesses and attorneys and certainly constituted a threat that if Mr. Moosbrugger did not settle his case the Court would find damages against the defendant without hearing the evidence that Mr. Moosbrugger was prepared to present.

"*Finding:* Referee finds that the conduct of the Respondent as outlined above would evidence conduct prejudicial to the administration of justice which brings the judicial office into disrepute in violation of Canons [Canon] 3A (3) and (4).

"*Sources:*
"Resp. Ex. 7, Transcript Clark Oil v. Koepp
"Testimony, Gordon C. Moosbrugger, T. Vol. 2, pp. 196–230
"Testimony, Richard M. Arney, T. Vol. 4, pp. 85–116
"Testimony, John T. McDonough, T. Vol. 15, pp. 71–74

"9. *David E. Doyscher—Taylor v. Taylor.* On or about March 31, 1977, Attorney Doyscher appeared, representing the respondent, Norris Taylor, which was a dissolution matter. The appearance was on an application for relief brought by the petitioner for temporary support, custody and alimony. Mr. Doyscher complained that the court set support at $400 per month for one child, and did not allow attorney Doyscher to make a final argument and failed to explain the reasons for the $400 per month temporary support. Doyscher's testimony did not contain any specific conduct on the part of the Respondent that could be termed abusive or inconsiderate. Respondent denies any misconduct. There was also evidence introduced which showed that Mr. Doyscher's client had the ability to pay the temporary support as ordered by the court.

"*Finding:* Petitioner failed to prove by clear and convincing evidence any misconduct on the part of the Respondent in the Taylor matter.

"*Sources:*
"Testimony, David E. Doyscher, T. Vol. 5, pp. 181–190
"Testimony, John T. McDonough, T. Vol. 15, pp. 94–95

"10. *Lawrence P. Geraghty.* Lawrence P. Geraghty, Attorney at Law, Hudson, Wisconsin, was called to testify concerning the point that the Respondent did not use presentence investigations in sentencing of driving under the influence of intoxicating beverage cases. Based on his observation of the method in which the Respondent was ordering all of those who appeared before him to 'The Project', and in view of the fact that Attorney Geraghty did not want his client, who lived in Minneapolis, and who had already paid a fee for attending Chalk Talks in Hennepin County, to be sent to 'The Project', he asked leave of the court to file an affidavit of prejudice and did so.

"*Finding:* Petitioner did not prove by clear and convincing evidence that there was any misconduct on the part of the Respondent in the Geraghty matter.

"*Sources:*
"Testimony, Lawrence P. Geraghty, T. Vol. 5, pp. 17–46

"11. *Joseph F. O'Brien matter.* Joseph F. O'Brien testified that on October 24,

1974, he, as executor of the Norvell Grady estate, appeared in the chambers of Judge Knutson in Washington County Courthouse. He was represented by attorney Edward Simonet. After the completion of the matter taken up in chambers, Mr. Joseph F. O'Brien came into the corridor or hallway of the courthouse and was standing next to James S. O'Brien (no relative). In addition there were a number of other people standing in the hallway, at which time the Respondent came out of a door and proceeded towards Joseph F. O'Brien, and when he got within approximately 10 or 15 feet angrily raised his hand in a threatening way, and as he came closer to Mr. O'Brien, said: 'Joe, 15 years ago I told you to leave Norvell Grady alone and stop practicing law in the State of Minnesota. I am going to sue you for $7500', and then departed. The Respondent denied making such statement to Mr. O'Brien, and the testimony of James S. O'Brien and Edward Simonet Jr. indicated that the Respondent was not abusive towards Joseph F. O'Brien and did not threaten to sue him.

"*Finding:* Petitioner did not prove by clear and convincing evidence that there was any misconduct on the part of the Respondent in the O'Brien matter.

"*Sources:*

"Testimony, Joseph F. O'Brien, T. Vol. 3, pp. 185–205

"Testimony, John T. McDonough, T. Vol. 15, pp. 69–71

"Testimony, James S. O'Brien, T. Vol. 17, pp. 48–49

"Testimony, Edward Simonet, T. Vol. 17, pp. 205–216

"12. *John H. Rheinberger—Luebker Inebriety commitment hearing.* An inebriety petition for commitment in respect to Eugene A. T. Leubker [sic] was filed in Washington County Court. Mr. John H. Rheinberger, attorney at law, represented Mr. Luebker. Rheinberger filed an affidavit of prejudice in respect to the Respondent. The original petition alleging inebriety came before the Respondent. The Respondent took no action in respect to the inebriety, but due to the fact that there was no

holding facility in Washington County for examination and temporary holding, the Respondent ordered Luebker to be transferred to St. Joseph's Hospital. The matter was appealed on a writ of habeas corpus by Mr. Rheinberger, and was heard by the Honorable John F. Thoreen, Judge of District Court, Tenth Judicial District, in which Judge Thoreen stated in respect to the Respondent:

"'The judge isn't making a decision. If anybody is making a decision the patient was making the decision and all that was done here was to carry out the process that was already provided by statute.

"'Now, under those circumstances the court feels that there has been compliance with the statute. The rights of the defendant were really protected here more by the court than the statute would require and I don't have the hard evidence but from looking at this file and looking at the petition that Mrs. Luebker [the petitioner] signed on January 12, that appears to me to be a petition for proceeding in Ramsey County.'

The District Court discharged the writ of habeas corpus brought by Mr. Rheinberger.

"Mr. Rheinberger in his testimony made various other allegations in respect to the Respondent which the Referee finds were unfounded.

"*Finding:* Referee finds that Petitioner did not prove by clear and convincing evidence that there was any misconduct on the part of the Respondent in the Rheinberger-Luebker matter.

"*Sources:*

"Testimony, John H. Rheinberger, T. Vol. 8, pp. 174–178

"Testimony, John T. McDonough, T. Vol. 16, pp. 7–12

"Resp. Ex. 25 (also marked Resp. Ex. 99) Transcript of proceedings, Eugene A. T. Luebker file

"The Board charges as follows:

"*Charge 7:* 'Respondent filed incorrect reports of compensation received for quasi and extra judicial activities, all in violation of Canon 6 of the Canons of Judicial Conduct.'

"Reports of the Supreme Court of the Respondent of quasi and extra judicial income for the year 1974 contains the following:

"'During the year 1974 I received approximately $415 for lectures. My detailed records were, for moving purposes from the old courthouse to the new courthouse were put in an expensive briefcase and during moving the briefcase was stolen or lost. The only lectures and fees therefor which I can actually reconstruct are the following:

'Sept. 1974 Minnesota Chemical Dep.
Assn., speech                                    $ 75.00
'Oct. 1974 Univ. of Wisconsin, speech      $150.00
'Nov. 1974 St. Joseph's Hospital,
speech                                          $ 40.00
                  'Total                        $265.00'

For the year 1975 Respondent reported to the Supreme Court $435.56 quasi and extra judicial income; and for the year 1976 Respondent reported to the Court $280.00 of such income.

"The Respondent's tax returns for these respective years show as follows:

"1974     $1084.00 quasi judicial income
"1975     $ 762.00 quasi judicial income
"1976     $ 579.00 quasi judicial income

The Respondent explained such valuations in his testimony that the $1084.00 reported in his income tax return in 1974 as income, included the expense money he got from the county, as follows:

"'Q. And that was a report from business or profession that would cover all of your quasi judicial income?

"'A. Not necessarily, because the accountant uses that word instead of showing that expense money I get from the county, which I also report.

"'Q. You report your expense money from the county?

"'A. Well, it's the easiest way to do it. That is how '74 includes some expense money you get, my lunches and things like that.'

An analysis of the expenses received from the county, which were attached to the tax returns, shows:

"1974          $703.73
"1975          $351.78
"1976          $299.04

This corroborates the Respondent's testimony. There was no showing by the Petitioner that the Respondent's explanation for this variance was not correct.

"*Finding:* That the Petitioner has failed to prove by clear and convincing evidence that the Respondent filed incorrect reports for compensation received for quasi and extra judicial activities.

"*Sources:*

"Pet. Exs. RRR, SSS, TTT, 1974, 1975, and 1976 Income Tax Returns of Respondent, with attached documents

"Testimony, John T. McDonough, T. Vol. 19, p. 32

"The Board charges as follows:

"*Charge 8:*

"'Respondent violated Canon 5D:

"'"A judge should not serve as the executor, administrator trustee, guardian, or other fiduciary, except for the estate, trust, or person of a member of his family, and then only if such serve (sic) will not interfere with the proper performance of his judicial duties."

"'and the Canon 7A (1) (c):

"'"A judge  .  .  .  should not:

"'"  .  .  .  (c)  .  .  .  make a contribution to a political organization or candidate except as authorized in subsection A (II)."

"'in that he accepted money for serving as an appraiser of the estate of an unrelated person and subsequently paid over part of the appraisal fee to the judge who was a political candidate and who appointed Respondent as appraiser.'

"*Finding:* No proof was presented by the Petitioner in respect to Charge 8 above and therefore it is found not proved.

"The Board charges as follows:

"*Charge 9:*

"'Respondent showed favoritism to the 1st National Bank of Stillwater in connection with Respondent's judicial administration of the Whalen Estate.'

*"Finding:* It being admitted by the Petitioner that the transaction alleged in charge 9 happened prior to June 15, 1970, therefore it is barred by the Statute of Limitations.

## SPECIAL FINDINGS

"The Respondent is 55 years of age, having been born on August 2, 1922. He was born and raised in Stillwater, Minnesota, and attended parochial school and high school in Stillwater. He was in the U.S. military service from 1942 through 1945 and served in the Fifth Infantry Division in England, France and Germany. He was honorably discharged from the military in 1945, and thereafter attended St. Thomas College in St. Paul, Minnesota, and obtained a B.A. degree in two and one-half years. In 1948 he was an unsuccessful candidate for the office of Lieutenant Governor of the State of Minnesota. In September, 1949 he began attending Georgetown University College of Law, Washington, D. C., and attended until he was called back into the military service for one year during the Korean War in 1950. His service occupation during this period was that of a cryptographer for the National Security Agency at Arlington, Virginia. He was honorably discharged from the military service and again pursued his law training at Georgetown University from when he graduated in August, 1952. The Respondent then returned to Minnesota, was employed by West Publishing Company of St. Paul, Minnesota in writing case headnotes for approximately nine months. He successfully passed the Minnesota Bar examination in August, 1952. He then returned to Stillwater, Minnesota, where he was engaged in the general practice of law from January, 1953 until 1956, when he was appointed as probate and juvenile judge of Washington County. The Probate and Juvenile Judgeship extended from 1956 until 1960, during which time the Respondent carried out a part-time practice of law in addition to his judicial position. In 1960 the judicial position became full time. The Respondent was consecutively re-elected four times, twice with opposition. He was last elected in 1974. His present term of office as Judge of County Court, Washington County, expires on December 31, 1980. In 1960 he was appointed Special Advisor to a 12-Member Federal Commission on Delinquency and throughout the period on the bench has been extremely active in problems of juvenile delinquency and alcohol and drug abuse.

"The Respondent is married and has five children. During the period 1963 to 1975 the Respondent has had extraordinary amounts of illness, both to himself and to his wife. In 1963 his wife underwent extensive surgery, and from 1963 to 1970 she was emotionally unstable with periodic hospitalizations. During such periods the care of the Respondent's children and home was basically that of Respondent. In the late 1960's the Respondent developed an addiction to alcohol and entered treatment at Chit Chat, Pa. in June, 1973 and completed such treatment in July, 1973. In October, 1972 the Respondent had surgery on his lower spine and in the summer of 1971 had knee surgery. In April, 1972 he was again hospitalized for spinal problems. In 1974 the Respondent had difficulty with his arms and cervical spine and underwent several cervical operations in 1975 and endured a long period of hospitalization therewith. In December, 1974 the Respondent's wife was hospitalized and surgery was performed in January, 1975 with extensive hospitalization.

"By reason of Respondent's illness and those of his spouse, he was under severe physical and emotional strain. In addition, during this period he was receiving relatively low salary and the cost of treatment and hospitalization, together with the cost of rearing and educating a rather large family, created a severe financial strain. The bizarre conduct of the Respondent prior to June, 1973 would appear to be a direct relation with his alcoholic problem, and it is reasonable to infer that a good deal of his later irritability, short temperedness and unusual conduct was related to his physical condition and the attendant emotional problems that he was experiencing.

"The Respondent's present situation in these respects appears to be greatly improved. His physical condition now appears to be good. His wife's illness and emotional problem appear to be much improved. The Respondent has overcome his alcoholic addiction and has used no alcohol since July, 1973. The financial burdens of the Respondent have lessened in that four of his children are educated and away from home. The last child is now attending college in Wisconsin. The increased salary which he is now receiving and the appreciated value of his homestead should enable the Respondent to secure the unsecured loan at the First National Bank of Stillwater and make regular payments to reduce the same.

"The following attorneys, who had extensive practice before the Respondent, testified that the Respondent possessed good judicial temperament and had never been abusive towards them:

"Darryl Morse (T. Vol. 17, p. 117)

"Michael Sieben (T. Vol. 17, p. 118)

"Joel A. Montpetit (T. Vol. 17, p. 143)

"Jack Nordby (T. Vol. 17, p. 154–155)

"Robert W. Kelly (T. Vol. 17, p. 173)

"Barry W. McKee (T. Vol. 17, p. 192)

"George Stunyo (T. Vol. 17, p. 202–203)

"Edward W. Simonet (T. Vol. 17, p. 205)

"Howard Turrentine (T. Vol. 21, p. 48–54)

"Wilbur L. Goyer (T. Vol. 21, p. 58–59)

"Peter Paulos (T. Vol. 21, p. 66–68)

"Harold D. Kimmel (T. Vol. 21, p. 75–78)

"Allen I. Nilva (T. Vol. 21, p. 100–101)

"Richard E. Aretz (T. Vol. 21, p. 109–111)

"John E. Jansen (T. Vol. 21, p. 116–117)

"Jon Arcand (T. Vol. 21, p. 124–126)

"Louise M. O'Neil (T. Vol. 21, p. 129–130)

"John E. Walsh (T. Vol. 21, p. 143–144)

"Paul A. Thuet, Jr. (T. Vol. 21, p. 161–162)

"Kenneth P. Griswold (T. Vol. 21, p. 177–178)

"Gerald E. Sikorski (T. Vol. 21, p. 191–192)

"Millett E. O'onnell [sic] (T. Vol. 21, p. 201–204)

"William F. Thuet (T. Vol. 21, p. 209–210)

In addition, approximately 63 other attorneys were prepared to testify in the Respondent's behalf as to proper judicial temperament and decorum. The Referee directed counsel for the Respondent that such additional testimony would be cumulative and their names were read into the record, and are found in Volume 17, pp. 215–217, and Volume 21, pp. 212–213. These attorneys were available for cross-examination purposes in the event the Petitioner wished to cross-examine any of them. A number of probation officers and other court officials testified and were of the opinion that the Respondent had proper judicial temperament and that he conducted his court in a highly professional manner. Among those who testified were:

"Lester F. Ploen, former Supervisor of Probation Services, Washington County

"Sharon Shelton, Deputy Clerk, Family Court, Washington County

"Margaret Casanova, Clerk of District Court, Washington County

"Sharon Pauley, Secretary, Washington County Attorney's Office

"Janet M. Plaster, Deputy Clerk, Conciliation Court, Washington County

"Richard Becker, Sergeant, Washington County Sheriff's Department

"Steven Scattum, Washington County Sheriff's Department.

"Based upon the testimony of such individuals, it would appear, except for the isolated instances which are the subject of this matter, the Respondent over the past 22 years has conducted his judicial office in a proper and judicious manner and has the respect of the majority of attorneys who appear before him. The majority of attorneys who testified were praiseworthy of Respondent in his judicial and social capacity.

"Several of the attorneys who had complaints against the Respondent testified that such complaints were related to specific incidents and that their general impression of the Respondent was that he handled his position as Judge of County Court on most matters expeditiously.

"A review of the entire record in this matter reveals and makes it glaringly clear that the Respondent's main problems arose

out of his close and personal relationship to the operation and management of 'The Project'. In relation to the charges against the Respondent set forth in the Complaint herein, the following are directly or indirectly related to Respondent's connection with 'The Project' and operation thereof:

"1. Arguments and disputes with Judge Albertson concerning assignments.

"2. The Champion matter—unauthorized use of the courthouse for 'The Project' purposes.

"3. Alleged mismanagement of the funds of 'The Project'.

"4. Alleged failure to notify the Chief Judge as to 'The Project's' accreditation.

"5. Alleged indiscriminate sentencings.

"6. The Lentz matter.

"7. Alleged failure to return to the Welfare Department of the State of Minnesota funds in 'The Project'.

"8. The accreditation of 'The Project'.

"9. The problem of P.S.I. investigations in D.W.I. cases.

"Canon 3 of the Code of Judicial Conduct provides:

" 'The judicial duties of a judge take precedence over all his other activities. His judicial duties include all duties of his office as are prescribed by law . . .'

"Canon 4 of the Code of Judicial Conduct provides:

" 'A judge, subject to proper performance of his judicial duties, may engage in the following quasi-judicial activities, if in doing so he does not cast doubt on his capacity to decide impartially any issue that may come before him.'

"Regardless of how meritorious or praiseworthy the objectives and goals of 'The Project' may be, a judge should not become so personally involved in a quasi-judicial matter that the performance of his official duties may be criticized, questioned or become suspect. Through his intimate connection with 'The Project' the Respondent has acted in a dual capacity; that of a judge and that of an administrator of a rehabilitation and corrections program. Serving in such dual capacity is bound to create conflicts, especially when the success and the very existence of 'The Project' depends on the income generated from those assigned to it. In serving in such capacity, doubt is and has been cast upon his capacity to decide impartially certain issues that come before him.

"As to any other charge as against the Respondent not specifically set forth herein, the Referee finds the same not to have been proved by clear and convincing evidence.

Dated: March 14, 1978     /s/ Thomas J. Stahler"

In April of 1978, Judge McDonough and counsel for the Board submitted objections to Judge Stahler's report. These were considered by the Board at its June meeting, and the Board's Proposed Adoption and Modification of Findings of Fact were sent to Judge McDonough. The Board heard oral argument on its tentative findings on July 28, 1978. On August 18, 1978, the Board unanimously adopted Findings and Recommendations as follows:

## "FINDINGS AND RECOMMENDATION OF BOARD ON JUDICIAL STANDARDS

"The Board on Judicial Standards hereby adopts the Findings of Fact of Judge Thomas J. Stahler, dated March 14, 1978, with the following exceptions, modifications and substitutions, as its Findings of Fact herein:

"A. As to *Finding* re: Paragraph IV(1)(D) of the Complaint as amended, the Board herewith makes the following *Finding of Fact:*

" 'That the record reveals that on March 4, 1963 the Respondent borrowed from the First National Bank of St. Paul the sum of $6,500.00 on an unsecured promissory note, which note was due and payable on March 16, 1964 and bearing interest at six percent per annum. This promissory note was co-signed by Peter C. Nielsen. The Respondent made no payment on this loan to the First National Bank of St. Paul on October 15, 1965 the

note was paid by Peter C. Nielsen and the First National Bank of St. Paul endorsed the note over to Mr. Nielsen. On June 4, 1971 Attorney John Hannaford, acting on behalf of Peter C. Nielsen, mailed a promissory note and letter to the Respondent requesting that the promissory note to Mr. Nielsen for $6,500.00 be signed and returned by the Respondent. The Respondent made no response to the Hannaford letter, nor did he sign the promissory note that was enclosed therewith. Peter C. Nielsen died testate on May 12, 1973 and the Respondent signed the Final Decree of Distribution and Final Account of Distribution of representation in Peter C. Nielsen estate on September 17, 1975. That such conduct violated Canons 29 and 32 of the Canons of Judicial Ethics (adopted March 3, 1966) and Canon 4C(2) and (4) of the Standards of Judicial Responsibility (adopted March 29, 1972). That Respondent was fully aware, at the time of the death of Mr. Nielsen, that he owed such debt to decedent. That Respondent failed to produce evidence competent to show what amount, if any, of said debt had been repaid by the rendering of services in lobbying on behalf of legislation relating to a humane slaughter bill and an animal adoption center. That Respondent may not, consonant with Canons 23 and 24 of the Canons of Judicial Ethics (adopted March 3, 1966) carry on such lobbying activities for remuneration.'

"The Board rejects the Findings of Fact of the Referee commencing at line 19, Page 6 [line 23 page 5 of this opinion] of said Findings and concluding at line 30 page 8 [line 33 page 6 of this opinion] thereof.

"B. As to *Findings* regarding Paragraph IV(2) of the Complaint, the Board herewith adopts *Findings* # 1 and # 2 on Pages 13 and 14 [Pages 9 and 10 of this opinion] of the Referee's Findings and makes the following additional *Finding:*

" # 3. That the Board takes notice that the First National Bank of Stillwater was, during the course of rendering preferential treatment to Respondent, the only banking institution in Washington County with a Trust Department; that it was acting in a fiduciary capacity in many estates and guardianships in said County; that its fees for so acting were subject to the approval of the Judge of Probate Court of Washington County and subsequently of the assigned Judge of said County Court; that during the course of said preferential treatment Respondent was the Probate Judge of said County or a Judge of the said County Court frequently assigned to such responsibilities. The action of the Respondent as set out in the foregoing, constitutes a violation of Canon 5C(1).

"C. As to *Finding* # 7 re Paragraph IV(6) of the Complaint, as amended, the Board adopts the Referee's Finding Commencing at p. 51, line 11 [Page 32, line 57 of this opinion] thereof, with the following addition:

"*Finding:* and that there was further misconduct by Respondent in his intemperate and abusive behavior toward Attorney Monson as established by the testimony and the contemporaneous memorandum of Mr. Monson of the events, and to some extent by the testimony of Attorney Griswold, in violation of Canon 3A(3).

"D. As to *Finding,* p. 57, [Page 37 of this opinion] re Paragraph IV (Charge) 8 of the Complaint, as amended, the Board rejects the Referee's Finding and hereby *Finds:*

"That no proof was allowed by the Referee to be presented by Petitioner as to Paragraph IV 8 of the Complaint because the Respondent had raised the defense of Statute of Limitations (MS Section 490.16 Subd. 3) at the Pre-Trial Conference; that the Referee had ruled, by Pre-Trial Order of October 12, 1977, that the statute applied to the substance of said charge; that consequently Paragraph IV 8 of the Complaint has not been litigated herein.

"E. As to the special *Findings* of the Referee commencing at p. 58, [Page 37 of this opinion] the Board accepts said special *Findings* as explanatory but not as excusing Respondent's conduct.

"F. The numerous incidents, clearly and convincingly shown by exhibits and the testimony of Messrs. Wrich, Harmon, Costello, Judge Bakke, Champion, Knefelkamp, Smith, Fillmore, Monson, Moosbrugger, Mr. and Mrs. Gearman, and Judge Albertson of abuse, intimidation and misbehavior toward litigants, attorneys and other public officials, together with Respondent's refusal to cooperate with the attempts of Chief Judge Albertson to administer the Washington County Court, indicate a continuing lack of judicial temperment [sic] on the part of Respondent. Such incidents include:

"1. Respondent's sending of his intemperate letters of criticism not only to Judge Bakke, but to the attorneys involved in violation of Canon 1 of the Standards of Judicial Responsibility of March 29, 1972.

"2. Respondent's acceptance of preferential treatment from the First National Bank of Stillwater in violation of Canons 5C(4)(b) and 5C(1).

"3. Respondent's failure to comply with the pre-sentence requirements of MSA 169.126 in violation of Canon 3, Subd. A(1).

"4. Respondent's threatening the County Coordinator and his failure to abide by the resolution of the County Board in violation of Canon 2A of the Code of Judicial Conduct.

"5. Respondent's making of abusive phone calls to Mr. Howard Costello in violation of Canon 2A of the Code of Judicial Conduct.

"6. Respondent's unprovoked verbal attack of Mr. James Wrich in violation of Canon 2A of the Code of Judicial Conduct.

"7. Respondent's attempted intimidation, by threat of public criticism, of Mr. Lawrence Harmon in violation of Canon 2A of the Code of Judicial Conduct.

"8. Respondent's public and abusive upbraiding of Mr. David E. Knefelkamp in violation of Canon 2A of the Code of Judicial Conduct.

"9. Respondent's refusal to cooperate with Chief Judge Howard Albertson's 'Judge of the Day' program in violation of Canon 3B(1) of the Code of Judicial Conduct.

"10. Respondent's failure to prepare and submit calendar schedules and reports as required by the Chief Judge of Washington County Court in violation of Canon 3B(1) of the Code of Judicial Conduct.

"11. Respondent's demonstrated disrespect of the County Court Chief Judge by insulting and cursing him in the presence of others in violation of Canon 3B(1) of the Code of Judicial Conduct.

"12. Respondent's intimidation of Mr. and Mrs. A. T. Gearman and verbal abuse of their attorney, Mr. Terry Smith, in violation of Canon 3A(3) and (4) of the Code of Judicial Conduct.

"13. Respondent's refusal to allow Mr. Warren Fillmore to testify in his courtroom without justification and which constitutes conduct prejudicial to the administration of justice in violation of Canon 3A(3) and (4) of the Code of Judicial Conduct.

"14. Respondent's misconduct in falsely accusing Attorney Robert Monson of coercing an individual to make a false affidavit and his verbal abuse of Mr. Monson in violation of Canon 3A(3) and (4) of the Code of Judicial Conduct.

"15. Respondent's threats toward and refusal to hear evidence offered by Attorney Gordon Moosbrugger evidencing conduct prejudicial to the Administration of Justice in violation of Canon 3A(3) and (4) of the Code of Judicial Conduct,

and establish a continuing pattern of the exercise of unjudicial temperment [sic] in the performance of Respondent's official duties.

"*Dated: August 25, 1978*

/S/ George C. King

George C. King
Chairman, Board on Judicial
Standards, State of Minnesota

## "RECOMMENDATION

"The Board on Judicial Standards, having heretofore made Findings of Fact herein, makes the following recommendation to the Supreme Court of the State of Minnesota:

"1. That Respondent be censured for his violation of the canons of judicial conduct as set forth in Findings of Fact A. and B.

"2. Because of the foregoing violations and the demonstrated lack of judicial temperment [sic] as shown by such Findings A. and B., and the other Findings of the Board, that Respondent be retired.

*"Dated: August 25, 1978*

    /S/ George C. King

      George C. King
      Chairman, Board on Judicial
      Standards, State of Minnesota

## "MEMORANDUM

"It is noted that the Findings and Recommendation of the Board were concurred in by David J. Coleman, Ruby Hunt, Honorable Gordon L. McRae, John W. Padden, Honorable Sewell Sawyer, Harvey A. Stegemoeller, Juanita H. Young and George C. King. The Honorable Robert H. Johnson disqualified himself.

    /S/ GCK
    GCK"

There are four categories to our review of this matter: (I) procedural claims, (II) legal issues, (III) factual findings, (IV) sanctions.

I. Judge McDonough specifies at least six different instances in which he believes the procedures followed by the Board violated its own rules and his right to due process of law.

A. Judge McDonough contends the Board proceeded in its initial investigation without proper authorization. Rule D (1) of the rules of the Board in effect at the time the investigation was begun in the fall of 1976[1] requires either a verified grievance or a motion of the Board before an investigation is initiated.[2] The Board appears to have violated this rule, though only in a technical sense. A sworn grievance had been made against Judge McDonough back in 1974 but that matter was closed shortly thereafter. In September of 1976, Judge Howard Albertson, Chief Judge of the Washington County Court, forwarded to the Board a letter to him critical of Judge McDonough, but this was not a verified grievance. Upon receipt of this letter, Chairman Dillon of the Board told Executive Secretary Kurvers to go ahead with an investigation. There never was a formal motion by the Board, though the minutes for the October 8th meeting of the Board report that it was the consensus of the Board that Mr. Kurvers continue to investigate.

This technical violation appears to have been harmless. The October 8th meeting presumably satisfies the spirit of the rule in that the Board knew of and approved the investigation. There is no claim that anything crucial or prejudicial took place between September 21 and October 8. While we cannot condone less than strict compliance with procedural rules, this is no ground for dismissal or remand. We note the issue is moot as to future cases—the present rules of the Board permit an investigation to be initiated "upon any reasonable basis." (Rule 6 (a)(1))

---

1. The Rules of the Board on Judicial Standards were replaced by new Rules on July 5, 1978, in the midst of the consideration of this case by the Board.

2. Rule D (1) of the Board's Rules provides as follows:

"1. The commission, upon receiving a verified statement of grievance found upon examination and inquiry to be neither unfounded nor frivolous, alleging facts that a judge may be subject to censure, removal or retirement pursuant to the provision of M.S. Section 490, shall make a preliminary investigation to determine whether a complaint shall be filed and a hearing held. The commission may on its own motion and without receiving a verified statement make inquiry and a preliminary investigation with respect to whether a judge is guilty of misconduct in office or is physically or mentally disabled. Upon request of the chief justice of the supreme court, the commission shall make a preliminary investigation of the conduct or physical or mental condition of a judge."

■ B. Chairman Dillon wrote Judge McDonough and invited him to appear before the Board at its January 17, 1977, meeting. On the evening before the meeting, Chairman Dillon by telephone told Judge McDonough not to come. Though Judge McDonough insisted on appearing anyway, he claims the disinvitation violated his right to be heard by setting the Board against his appearance and rendering the presentation he did make ineffective. However, there was no rule violation here. Judge McDonough seems to imply that he had a right to this appearance under Rule D (2), but this is incorrect. Rule D (2)[3] grants a right to respond to the Notice of Inquiry, which was not served until May. Thus, the January invitation was at the discretion of the Board, and so also was the cancellation. Though no rule violation occurred here, this incident was nevertheless unfortunate. Many of the misunderstood and unsubstantiated charges against Judge McDonough could have been clarified by more direct communication between the judge and the Board at an early stage in these proceedings.

■ C. Judge McDonough contends his right under Rule D (2) to respond to the Notice of Inquiry even after it was served in May was prejudiced because the Board had already decided to issue a complaint. The claim is that the Board's counsel informed Judge McDonough's counsel of this decision, resulting in Judge McDonough waiving a response because it would be pointless. We are unwilling at this late date to nullify this proceeding on the basis of such a double hearsay statement. We observe that the face of the Notice of Inquiry grants Judge McDonough the right to respond. Whether or not the Board's counsel was attempting to discourage a response or just upon request trying to accurately assess the situation is a significant and unanswered question at this point; in that respect we note the call was initiated by Judge McDonough's counsel. In short, no rule violation has been proven.

■ D. Judge McDonough complains about the manner in which Judge Stahler's report was considered by the Board. Rule M of the old Board rules gives a respondent the right to file written objections to the referee's report; Rule N provides for a personal appearance.[4] Judge McDonough's claim is that Rule N was violated because the Board made modifications of Judge Stahler's report on June 21, 1978—before hearing from Judge McDonough on July 28. This claim is not quite accurate. On June 21 the Board made only tentative modifications; the final Findings and Recommendations were not approved until August 18—after Judge McDonough had been heard from—and differed in certain particulars from the proposed draft. Thus, there was no rule violation. Nevertheless, the obvious intent of Rule N is to allow the Board's decision-making to be informed by input from the respondent, and it would perhaps have been more in keeping with the spirit of this rule for the Board to have avoided becoming committed in any way to a posi-

3. Rule D (2) provides as follows:

"2. Before filing a complaint or recommending an order of private censure, the commission shall give written notice to the judge of the nature of the charges being made against him and he shall be afforded a reasonable opportunity to present personally, in writing or orally, such matters as he may choose for consideration by the commission explaining, refuting, or admitting the alleged misconduct or disability."

4. Rule N provides: "*Appearance before Commission*  If no statement of objections to the report of the referee is filed within the time provided, or if the consent of counsel and respondent is filed in writing, the findings of the referee may be deemed as agreed to and the commission may adopt them without a hearing and recommend to the supreme court such order for disciplinary action, removal, retirement, or suspension as may be appropriate thereunder. If a statement of objections is filed, or if the commission in the absence of such statement proposes to modify or reject the findings of the referee, the commission shall give the respondent and counsel an opportunity to be heard on oral arguments before the commission on the record before the referee along with briefs of the parties. Written notice of the time and place of such hearing shall be sent to the parties at least 10 days prior to the date of hearing.

tion before hearing from Judge McDonough.[5]

E. Rule R of the old rules requires that discipline must be recommended by the votes of at least five members "who have considered the report of the referee and objections thereto . . ."[6] Judge McDonough claims there was only one copy of the Referee's 65 page report available to the Board, making compliance with Rule R impossible. This contention appears incorrect. The minutes of the Board's March 17, 1978, meeting indicate that copies of the report were distributed to the members present. The Board claims copies were thereafter also distributed to new members and those not present on March 17.

██ F. Finally, Judge McDonough claims that the Board's counsel dehorred the record concerning the Neilsen note matter at the July 28 hearing before the Board. Counsel's statement was: "I was calling Mrs. Neilsen and Mr. Neilsen's bookkeeper at the close of these proceedings on the last day, kind of running out of time before Christmas, and Judge Stahler did not allow me to call these witnesses in rebuttal, I think it might have made some things clear-

er . . ." This statement, though improper, is so non-specific as to rule out the possibility of prejudice before a sophisticated commission.

In addition to these specific claims, Judge McDonough raises a number of general issues concerning the fairness of this proceeding. He objects to the Board's practice of "investigating" a complaint by interviewing only the complainant and not other witnesses that may have a different story. He complains that the "scattershot" nature of the Board's charges, many of which went unsubstantiated or upon which no evidence at all was offered, made the preparation of a defense difficult and unduly burdensome. He points out the short notice upon which he often was forced to respond to adverse claims and witnesses. In this regard, attention is drawn to Judge Stahler's "comments" at the conclusion of his report.[7] We agree that these are procedural deficiencies which at least should be remedied in future proceedings.

In summary, however, we find that these procedural claims, individually or in aggregation, do not keep us from proceeding with

5. The Board contends Judge McDonough had no right to a personal appearance because the new Board rules do not so provide and they went into effect July 5. Regardless of the propriety of changing to new rules in the middle of a proceeding, we note that it was on June 21, before the new rules took effect, that Rule N was neglected in spirit if not in letter.

6. Rule R (1) provides: "*Commission Decision 1.* The affirmative vote of five members of the commission who have considered the report of the referee and objections thereto, or who were present at any oral hearing before a referee, or, if the hearing was before the commission without a referee, the affirmative vote of five members of the commission who have considered the record, and at least three of whom were present when the evidence was taken, is required for a recommendation of discipline, removal, retirement, or suspension of a judge. In the absence of such votes, an order of dismissal of the complaint shall be entered by the commission. Any commissioner may file a written dissent."

7. For example, Judge Stahler recommended: "1. Sufficient clear and convincing evidence to support a particular charge should be obtained prior to the issuance of a formal complaint

alleging such charge. In the instant case, the charges herein were broad and covered an extended period of time. As to several of the charges, no evidence was introduced, and as to several other charges, clear and convincing evidence was lacking. In view of the fact that such charges are serious, and the fact that the Respondent, in order to meet all charges, was required to prepare proper defenses to each, he was placed under unnecessary and undue burden in preparing to face such charges as to which no evidence was produced."

"3. Investigation by the Board in respect to the particular charges should be more thorough. In addition to interviewing the complainant, the investigation should include interviewing of all persons who may have knowledge about the particular incident, even though such knowledge may prove to be adverse to that of the complaining witness. If such practice were followed, the Board would have a better basis upon which to determine whether a specific complaint should result in a formal charge, and the Board would be in a better position to determine whether or not a particular charge could be proved by clear and convincing evidence."

our review of the merits of this case. They have not gone unnoticed, however. The allegations of unfairness surrounding this matter have resulted in particularly zealous study by every member of this court of the record before us, conducted with a heightened awareness of our independent role. Because the Supreme Court's independent judgment is involved here, we are somewhat less concerned about the possible biases and procedural shortcomings below. This view of the matter, of course, still depends upon the adequacy of the record before us. We have been concerned about this point. Both parties have praised Judge Stahler's conduct of the hearing, however, and his competence and neutrality are above reproach. To the extent the procedures affecting the creation of the record varied from the ideal, the remedy would be to remand to Judge Stahler with directions to give the parties an opportunity to present additional evidence on disputed issues. At oral argument before this court, both parties stated that a remand for the taking of additional evidence was not wanted.[8] This being the case, it is our conclusion that none of the procedural defects specified is of sufficient seriousness to nullify the proceedings, and we proceed to consider the case on the merits. The obvious difficulties with institutional inertia in a proceeding of this type are of concern, and we express our confidence that with additional experience the Board will act to minimize them and avoid the assumption of an adversary posture.

■ II. It has been necessary to resolve two legal issues in disposing of this case. When this case began, the Board was operating under a statute of limitations as follows:

> " * * * [T]he supreme court may * * * censure or remove a judge for action or inaction occurring not more than four years prior to such action being reported to the board on judicial stan-

dards * * *." Minn.St.1976, § 490.16, subd. 3.

The parties are in disagreement regarding the application of this limitation. The Board's position, adopted by Judge Stahler, is that the statute permits consideration of all incidents taking place less than four years before the initial complaint made against Judge McDonough by Reverend Dixen on June 15, 1974. Judge McDonough's position is that this incident was closed and that only events less than four years before the Notice of Inquiry of May, 1977 may be considered.

Our reading of the statute is different. It does not forbid consideration of incidents occurring before a given four-year time span. Rather, it restricts Supreme Court action to those incidents which were *reported* to the Board within four years of their occurrence, no matter how old they are when considered. The practical effect of this interpretation is to eliminate from our consideration only the letter of Judge McDonough to Judge Bakke, written in May of 1972 and not reported to the Board within four years. Accordingly, this incident has been disregarded in our imposition of sanctions.

We note in passing that the statute of limitations was repealed in 1978, after the hearing before Judge Stahler. Thus, future proceedings will be unrestricted.

■ The second legal issue concerns the meaning of the "clear and convincing" standard by which the allegations in a judicial discipline case must be proven. The parties agree that this is the proper standard, based on *In re Gillard,* 271 N.W.2d 785 (Minn. 1978) and the order issued by this court on October 27, 1977, Supreme Court File 48183, in the disciplinary case of Judge Searle Sandeen.[9] The dispute concerns the specific meaning of this standard. Judge McDonough relies on the following language in *In re Boyd,* 308 So.2d 13, 21 (Fla.1975), to

---

8. A motion on behalf of Judge McDonough to remand to Judge Stahler for the limited purpose of recommending sanctions to the Supreme Court has been considered and is denied.

9. The clear and convincing standard is mandated for future disciplinary cases by Rule 9 (c) (2) of the Board's rules adopted July 5, 1978.

assert that the standard implies corroboration:

"This Court in the *Rayman* [*The Florida Bar v. Rayman* (Fla.1970), 238 So.2d 594] case relying on several cases in this and other jurisdictions held that evidence to sustain a charge of unprofessional conduct against a member of the bar where in his testimony under oath he has fully and completely denied the asserted wrongful act, must be clear and convincing and that degree of evidence does not flow from the testimony of one witness unless such witness is corroborated to some extent either by facts or circumstances."

We find this position unpersuasive. The clear and convincing standard arises from an appreciation of the gravity of a disciplinary proceeding and the magnitude of the loss to which a disciplined judge is subjected. No mechanistic corroboration requirement is necessary; uncorroborated evidence may be clear and convincing if the trier of fact can impose discipline with clarity and conviction of its factual justification. In fact, depending on its source, uncorroborated evidence may be more reliable than that remotely corroborated by a dubious source. Thus, to establish such an arbitrary requirement would be counterproductive, and we will not do so.

III. We have set out above the complete factual findings of Judge Stahler and the modifications to those findings submitted by the Board. As is clear from this material, the Board adopted the bulk of Judge Stahler's findings. The factual issues in this case then center around those four findings on which the Board and Judge Stahler disagree. We take up in turn these areas of disagreement, and then proceed to express our view of the 13 other findings of Judge Stahler with which the Board is in agreement.

A. *Neilsen Note* (Charge IV (1) (D)) Judge Stahler and the Board disagree on whether or not the $6,500.00 debt of Judge McDonough to Peter Neilsen was ever forgiven, and whether Judge McDonough's judicial actions in eventually closing the Neil-

sen estate were proper. The debt resulted from Neilsen picking up a note of Judge McDonough's to the First National Bank of St. Paul which Neilsen had co-signed. In its finding "A" the Board flatly states that this debt was not forgiven and it was therefore an ethical violation for Judge McDonough to sign the final decree in the Neilsen estate without disclosing this debt. Judge Stahler found no violation because the evidence supported Judge McDonough's claim that the debt had been paid off by services rendered to Neilsen, that Neilsen had instructed his attorney to cease efforts to collect on the note, and that the note was transferred by Neilsen to a revocable trust in 1971 and was not an asset of the estate when acted upon by Judge McDonough.

Our view of the matter is that there was no violation resulting from Judge McDonough's actions in closing the Neilsen estate. The documentary evidence establishes beyond a doubt that the note was not an asset of that estate at Neilsen's death and Judge McDonough was therefore not closing an estate to which he owed money. Though the better course may have been for Judge McDonough to disclose his financial dealings with Neilsen and affirmatively establish that the debt had been satisfied, forgiven or transferred, his actions here amounted to a pro forma signature on an estate file showing no assets or liabilities, and we find no ethical violation therein.

■ B. *Lobbying* Because Judge McDonough explained the satisfaction of his debt to Neilsen in terms of his contribution of services to Neilsen's extensive efforts to improve the treatment afforded animals, the Board found that Judge McDonough "may not" engage in lobbying activities for remuneration. If this is a finding of an ethical violation, which is not altogether clear, it must be disregarded in our imposition of sanctions. Regardless of the question of whether or not Judge McDonough in fact actually engaged in lobbying, this charge was not formally made against Judge McDonough, nor was it submitted to and considered by Judge Stahler. Absent such procedural regularity such a finding has no place in a proceeding of this nature.

C. *Preferential Bank Treatment* (Charge IV (2)) Judge Stahler found that Judge McDonough received and accepted preferential treatment from the First National Bank of Stillwater in the form of large numbers of uncharged overdrafts on his wife's checking account and an unsecured loan eventually amounting to over $20,000. Judge Stahler found this to be a violation of Canon 5C (4) (b),[10] in spite of his additional finding that there was no proven reciprocal favoritism shown by Judge McDonough toward the Bank. The Board went one step further, finding a violation of Canon 5C (1)[11] because the Bank often appeared in Judge McDonough's court in connection with estates and guardianships and its fees were subject to his approval.

Our view of the matter is that, although Judge McDonough's continuous indebtedness is unfortunate, it was due to acknowledged family and medical expenses beyond his control and there is no ethical violation here. The mandate of Canon 5C (4) (b) is that a judge may not accept a loan except "on the same terms generally available to persons who are not judges." It is common knowledge that financial institutions take community reputation and professional stature into consideration when extending credit or assessing discretionary fees. While the question of whether the treatment afforded Judge McDonough is "generally available" is a close one, there is no evidence that it was motivated by the unique fact of his judgeship or that other good "credit risks" could not receive similar treatment. Our overall conclusion is that no harm was done here, and this also determines our view of the Board's Canon 5 C (1) finding. There is no evidence that the Bank or anyone else expected it to be treated in any special way in Judge McDonough's court. Thus, though there may be here an appearance of impropriety that disturbs us, we cannot see that it rises to the level of "reflect[ing] adversely on his impartiality."

D. *Abuse of Monson* (Charge IV (6)) Both Judge Stahler and the Board agree that Judge McDonough acted unethically in accusing attorney Monson of coercing a false affidavit from 19-year old David Fritz in the divorce case of his parents. The Board goes further, however, and finds an additional violation of Canon 3 A (3)[12] because of Judge McDonough's "intemperate and abusive behavior toward Mr. Monson." The differing evidence on this point is not critical to our resolution of this case, and we make no effort to characterize it one way or another.

The next series of findings of Judge Stahler, taken up in the order he made them, was adopted by the Board.

E. *Presentence Investigation* (Charge IV (3) (B)) Judge Stahler found a violation of Canon 3 A (1)[13] because of Judge McDon-

10. "Canon 5 C (4) (b)

"(4) Neither a judge nor a member of his family residing in his household should accept a gift, bequest, favor, or loan from anyone except as follows:

"(b) a judge or a member of his family residing in his household may accept ordinary social hospitality; a gift, bequest, favor, or loan from a relative; a wedding or engagement gift; a loan from a lending institution in its regular course of business on the same terms generally available to persons who are not judges; or a scholarship or fellowship awarded on the same terms applied to other applicants;"

11. "Canon 5 C (1)

"C. Financial Activities.

"(1) A judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, exploit his judicial position, or involve him in frequent transactions with lawyers or persons likely to come before the court on which he serves."

12. "Canon 3 A (3)

"Adjudicative Responsibilities.

"(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control."

13. "Canon 3 A (1)

"Adjudicative Responsibilities.

"(1) A judge should be faithful to the law and maintain professional competence in it.

ough's practice of sentencing alcohol-driving offenders to the Washington County Alcohol/Drug Survival Project without the presentence investigation required by Minn.St. 169.126. Judge McDonough's justification—that the Project in effect complied with 169.126 and was indeed superior to the standard PSI in terms of an in-depth assessment of an individual's alcohol problem—is persuasive, particularly in light of the 1977 legislation specifically approving programs such as the Project. Judge McDonough himself admitted the sentence was imposed *before* enrollment in the Project, so there is no doubt there was a technical violation of Minn.St. 169.126 and Canon 3 A (1). But given the good faith nature of the violation, its contribution to the imposition of sanctions is minimal.

F. *Threatening County Coordinator Champion* (Charge IV (4) (B)) Judge McDonough's statement to County Coordinator Champion, "I will have your ass in jail if you interfere with those meetings", referring to Champion's attempt to stop Project meetings from being held in the courthouse during a strike of county employees, has been clearly and convincingly established. Not only is it improper for a judge to speak in such a tone regarding any matters in which he acts in a professional capacity, but the threatened misuse of his contempt powers makes this incident particularly egregious, and the violation of Canon 2 A [14] is manifest.

G. *Abusive Phone Calls to Costello* (Charge IV (C)) Because of the sharp factual dispute on this issue, its potential seriousness, and our difficulty in arriving at a determination, an extended discussion of this incident is in order.

Judge McDonough was the director of the Reverend Miller Foundation which raised $156,000 to construct a chapel at the state prison. This money was presented to the state in 1972, but the chapel was not built because of uncertainty about the future of the prison building. In the fall of 1973, Judge McDonough made several angry phone calls regarding this matter to Howard Costello, Assistant Commissioner of Corrections, at his office. In the next 6 months Costello received 10 or 12 anonymous calls at his home in the middle of the night. If Mr. Costello answered, the caller would curse at him for several seconds before hanging up. If Mrs. Costello answered, the caller would hang up. Mr. Costello testified that he recognized the voice as Judge McDonough's. Finally, during one call Mr. Costello said, "John, what is the matter? I know who is calling me." No more cursing calls were received thereafter.

At the hearing Judge McDonough denied making the calls. He explained that he knew Costello was not at fault for the delay on the chapel, so the asserted motive is non-existent. Mrs. McDonough corroborated his testimony, saying Judge McDonough never gets up after retiring and that she, a light sleeper, has never heard him make such calls. Furthermore, Judge McDonough points out that as Costello was a corrections official, there were many possible sources of obscene phone calls. He also argues that such surreptitious activity is totally out of keeping with his bold and forthright character. For example, he did not hesitate to identify himself during the angry calls in the fall.

We are unable to accept the conclusion of Judge Stahler and the Board that Judge McDonough clearly and convincingly made the calls. That high standard of proof usually would require more than one man's word against another, especially where, as here, mistake cannot be ruled out. Costello testified there was "no doubt" in his mind that the voice was Judge McDonough's; yet there cannot be eliminated the possibility of another caller with a similarly distinctive voice or even the name "John". On the other hand, there was great pressure upon Judge McDonough to lie about his involve-

He should be unswayed by partisan interests, public clamor, or fear of criticism."

**14.** Canon 2 A. "A judge should respect and comply with the law and should conduct him-

self at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

ment, but we agree that both surreptitious activity and subsequent denial are inconsistent with his characteristic frankness. Besides, what would anonymous calls do to expedite the chapel, if that is the alleged motive? In sum, while the question is a close one, there is insufficient evidence here to discipline a public servant of 23 years because someone thought a late night voice on the phone was his.

H. *Abuse of Minnesota State Alcohol and Drug Authority Director Wrich* (Charge IV (4) (H) (1)) Judge Stahler's finding that Judge McDonough cursed and abused Wrich in violation of Canon 2 A is supported by clear and convincing evidence. The context is important, however. The dispute was a professional one about which both men felt strongly. Wrich admitted that he, too, cursed Judge McDonough in their conversations. Moreover, it appears that Judge McDonough did not "go" to the newspapers, but the matter came up under other circumstances. Judge McDonough's statement about pressure from Anoka County legislators while incorrect, was apparently made in good faith. Consequently, while we could never condone this conduct, because it did not take place in a courtroom, severe sanctions are not called for.

I. *Abuse of State Court Administrator Harmon* (Charge IV (4) (H) (2)) As with the prior incident, there is no doubt of the 2 A violation. Also similarly, the matter was a dispute between two professionals not involving Judge McDonough's conduct on the bench. The matter was never "taken to the press." Nevertheless, Judge McDonough's conduct fell far short of what is expected of a judge.

J. *Abuse of Officer Knefelkamp* (Charge IV (4) (H) (3)) Our view is precisely that of Judge Stahler—the reprimands were improper because delivered in public, which makes their merit irrelevant. Particularly as to the search warrant obtained under false pretenses, however, Judge McDonough may have had reason to be upset.

K. *Absence While Judge of the Day* (Charge IV (5) (B)) The record is clear that on occasion Judge McDonough was not in the courthouse as required by the "judge of the day" program. The violation of Canon 3 B(1) [15] is purely technical, however the evidence establishes that courthouse personnel knew where Judge McDonough could be found, and there is no suggestion that he attempted to shirk his responsibilities. To the contrary, it is evident that he is a hard working and conscientious judge. There is no convincing evidence that harm ever resulted from his occasional absences.

L. *Failure to Submit Required Calendars* (Charge IV (5) (C)) Our view here is that of the prior incident, with this exception—Judge McDonough may have at times had valid reason to be absent from the courthouse, but we can think of no reason to refuse to comply with calendar requirements other than an obstinacy which has no place in relations between professionals. Thus, even though the calendar information was readily available in somewhat different form and no proven harm resulted from his refusal, this 3 B (1) violations of concern.

M. *Confrontations with Judge Albertson* (Charge IV (5) (D)) The breakdown of relations between Judge McDonough and his administrative superior is a central theme in the record. The four specific confrontations singled out by Judge Stahler as violations of Canon 3 B (1), with which we concur, are symptomatic of this deterioration. Judge McDonough attempts to characterize the problem as a "personality clash", which it certainly was; the apparent implication being either that such a phenomenon is beyond the control of those involved or involves fault on both sides. We are unwilling to accept this as a valid excuse. There may be limits within which a superior official must act if he is not to excuse a subordinate's obligations of courtesy and respect. If so, those limits have not been transgressed in this case. It was a

---

**15.** Canon 3 B (1). "A judge should diligently discharge his administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials."

professional responsibility of Judge McDonough's to get along with Judge Albertson to the extent necessary to carry out their respective duties; he has failed in that responsibility and will be sanctioned for it. Whether greater tact on Judge Albertson's part should have been expected is a separate question not here at issue.

N. *Threatening Gearman* (Charge IV (6) (2)) There is some uncertainty regarding precisely what Judge McDonough said to Gearman. But whether he affirmatively threatened to call in the press or just emphasized the possibility of coverage, there is no doubt that his words and actions intimidated Gearman into settling the dispute and abandoning his right to a hearing. We concur in Judge Stahler's finding of violations of Canons 3 A (3) and (4) [16] and in his emphasis that the legal issue in this matter is irrelevant. Even if Judge McDonough were undoubtedly correct on the law, Gearman was entitled to a hearing. For the judge to intimidate a witness into giving up that right is as serious a misuse of the judicial office as we can conceive of. Only Judge McDonough's apparent motivation, which was his characteristically fierce belief in the correctness of his legal positions and desire to have them implemented rather than malice toward Mr. Gearman or desire for personal gain, mitigates the seriousness of this matter. Nevertheless, it is the role of a judge to receive evidence and argument on disputed issues with an open mind and to render a decision in due course, not to become a crusader for his particular interpretation. Judge McDonough here has exceeded the limits of that role and sanctions are called for.

O. *Not Allowing Fillmore to Testify* (Charge IV (6) (3)) Judge McDonough may have been correct in not allowing a claims adjuster to testify in conciliation court for the same reasons that lawyers are barred. But the manner in which he did so was uncalled for and we adopt Judge Stahler's finding of a Canon 3 A (3) violation.

P. *Accusing Monson* (Charge IV (6) (7)) Judge McDonough does not really deny that he accused Attorney Monson of coercing David Fritz into recanting an earlier affidavit regarding his mother's alleged alcoholism. This is a discourteous and gratuitous remark, and Judge Stahler's finding of a 3 A (3) violation is adopted.

Q. *Abuse of Moosebrugger* (Charge IV (6) (8)) There is some suggestion that Attorney Moosebrugger was not free from fault here, but Judge McDonough's conduct lacked the professional poise expected of him and violates Canon 3 A (3). We note that the more serious question of the adequacy of the hearing was mooted by the assignment of the case to another judge.

IV. Our remaining task is to accept or modify the recommendation of the Board on Judicial Standards that Judge McDonough be censured and retired. We are not inclined to follow the Board's recommendation. Retirement is an appropriate sanction from the Board's point of view, given that body's findings on the Neilsen note, preferential treatment from the First National Bank, and anonymous phone calls to Costello. But our contrary findings or characterizations of these matters eliminate deliberate or long-term misconduct or that motivated by pecuniary self-interest from this case. Removal from office is less mandatory in the absence of such behavior.

The findings of misconduct which we have adopted collectively create a picture of Judge McDonough too often lacking the

---

16. "Canon 3 A (3) A judge should be patient, dignified and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control."

"Canon 3 A (4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond."

patience, open-mindedness, and restraint required of a judge. The Board refers to these personality factors as "lack of judicial temperament," and we find the phrase not entirely inappropriate. There is no doubt that, in the extreme, such lack of judicial temperament could be of itself grounds for removal even absent self-enrichment or bad faith. The effective functioning of the judicial system depends not only on justice in fact being administered but that citizens feel they are being provided fair treatment and just decisions. Professional conduct on or off the bench which impermissibly injures this necessary judicial image may at times be effectively dealt with only by removal.

In this case, however, there is more than just a collection of incidents illustrating lack of judicial temperament. Judge McDonough has served the people of Washington County for 23 years; reelected four times. Judge Stahler reported that except for these isolated outbursts that service has been "proper and judicious." Several Washington County employees and 23 attorneys came forward to testify to Judge McDonough's proper conduct of his office; 63 more attorneys were prepared to do likewise. Judge McDonough's community activities in the juvenile and chemical dependency areas have been recognized nationwide. These factors as much deserve our consideration as the findings of misconduct.

Another factor has to be considered. The outbursts of temper and combativeness exhibited by Judge McDonough may seem possibly to be symptoms of neurological or psychological disorder. This possibility has been ruled out, however. Judge McDonough has cooperatively submitted to a complete neurological and psychological examination arranged by this court. He has received a clean bill of health: "[t]here was no test evidence of organic psychological impairment and no finding of any other major psychiatric disorder." The psychological examiner did report the personality traits one might expect of an individual involved in the incidents reported above— "intensity, emphasis on assertiveness, rigid belief system, need to control, impatience, and defensiveness." These are not pathological, however—all individuals have personalities less than ideally suited for all situations. We trust that an awareness of these traits will make their control by Judge McDonough more readily achievable.

Additional considerations in this case are the medical and alcohol problems of Judge McDonough. As Judge Stahler found:

"By reason of Respondent's illness and those of his spouse, he was under severe physical and emotional strain. In addition, during this period he was receiving relatively low salary and the cost of treatment and hospitalization, together with the cost of rearing and educating a rather large family, created a severe financial strain. The bizarre conduct of the Respondent prior to June, 1973 would appear to be a direct relation with his alcoholic problems, and it is reasonable to infer that a good deal of his later irritability, short temperedness and unusual conduct was related to his physical condition and the attendant emotional problems that he was experiencing.

"The Respondent's present situation in these respects appears to be greatly improved. His physical condition now appears to be good. His wife's illness and emotional problem appear to be much improved. The Respondent has overcome his alcoholic addiction and has used no alcohol since July, 1973."

Abstinence by an alcoholic surely creates emotional stress which can detract from professional conduct. Having by now demonstrated his control over alcoholism should hopefully remove this detrimental factor from the future conduct of Judge McDonough.

Taking all these circumstances into account, and after lengthy study and deliberation on these difficult questions, it is our conclusion that we will not deprive the citizens of Washington County of the services of this man. They know him and his work and are in a position to evaluate his performance, and their votes will no doubt soon remove him if they determine we have

misjudged him. However, there has been serious misconduct in this case, and we hereby publicly censure Judge McDonough for the violations of the Code of Judicial Conduct detailed above. To ensure that our view of the seriousness of these matters is appreciated, we also hereby order that Judge McDonough forfeit his salary for the three months following the filing of this opinion as a fine.[17]

Finally, it should be clear that Judge McDonough stands here at the brink of forced judicial retirement. It is not our intention that the filing of this opinion and the payment of the fine shall end this matter, with things to continue in Washington County as before. Judge McDonough is in effect on probation for the remainder of his service as a judge, and we intend to monitor his performance with interest. He has received about all the patience and consideration he can expect from this court and now knows exactly where he stands. Consequently, should there be any recurrence of the kind of conduct that has been proven in this proceeding, further sanctions including forced retirement will be swiftly imposed. The standard of conduct expected of Judge McDonough must go beyond strict adherence to the Code of Judicial Conduct though that, of course, is the place to start. We refer specifically to the need for Judge McDonough to cooperate in every way possible with his administrative colleagues and supervisors. In light of the high standards hereafter expected of Judge McDonough, and because his subsequent judicial performance will no doubt be the subject of intensified public scrutiny, we have also decided it best that he put his financial relationship with the First National Bank of Stillwater on a more normal footing, including the securing of the loan or, better yet, its refinancing through another bank. Until such time as that may be accomplished, it is our order that Judge McDonough not sit on cases involving the First National Bank either as a party, guardian, or trustee.

Recommendation modified in accordance with the above opinion.

17. See Rule 10 (c) (6) of The Rules of The Board on Judicial Standards.

SHERAN, Chief Justice (concurring in part, dissenting in part).

I dissent from the opinion of the majority because in my view:

1. It was Judge McDonough's duty to disclose his financial dealings with Neilsen and affirmatively establish that the debt had been satisfied, forgiven or transferred before the Neilsen estate was closed.

2. The treatment given to and accepted by Judge McDonough from the First National Bank of Stillwater was preferential. I agree completely with the Board's assessment of this aspect of the case.

3. Judge Stahler's findings as to the Costello telephone calls are sustained by clear and convincing evidence. It is not simply a case of one man's word against another's. Mr. Costello was a disinterested witness. His reliability was established. He knew Judge McDonough well enough to be certain in his mind that the calls in question came from him. The fact finder in this case is an experienced, fair and highly competent district judge. He heard the conflicting testimony; assessed the response to cross-examination; and, most important of all, he observed the witnesses whose testimony was in conflict. Of his findings of fact in an extremely complicated and demanding case the only one rejected by the majority opinion is this critical one. I would confirm it.

I agree with this statement on page 62 of the majority opinion:

"Retirement is an appropriate sanction from the Board's point of view, given that body's findings on the Neilsen note, preferential treatment from the First National Bank, and anonymous phone calls to Costello."

If the majority is right in rejecting these findings, I believe the sanctions imposed are acceptable so long as it is clearly understood that repetition of incidents like those found sustained by clear and convincing evidence will not be tolerated in the future.

STONE, Justice (concurring specially).

I concur with the findings reached by the majority opinion except I join with the dissent of the Chief Justice concerning hearing of the Neilsen estate without full disclosure and preferential treatment of the Bank. In my opinion both of these matters were established to be in violation of the Judicial Standards.

Given the findings of the majority. I agree with the sanctions imposed.

## ON MOTION FOR SUPPLEMENTAL ORDER

KELLY, Justice.

This matter is before us on motion of the Honorable John T. McDonough, Judge of the County Court for Washington County, for a supplemental order of this court directing the Minnesota State Board on Judicial Standards to close its file on the "Bartholet Matter."

By virtue of the nature of our decision in *In re McDonough,* 296 N.W.2d 648 (Minn. 1979) filed March 23, 1979, we retained continuing jurisdiction in this case. Therefore, Judge McDonough moves this court for a supplemental order pursuant to Minn.R.Civ. App.P. 127. For the reasons hereinafter discussed, the motion is granted.

In September of 1976 the Board on Judicial Standards initiated an investigation of Judge McDonough. Formal proceedings began with service of Notice of Inquiry in May of 1977 and a Complaint in June of 1977. Twenty-two days of hearing before the Honorable Thomas J. Stahler, District Judge of the Eighth Judicial District, followed in November and December of 1977. He issued his findings in March of 1978. The Board made numerous charges of mis-

conduct, some of which were found proved by clear and convincing evidence and others of which were found not proved both by Judge Stahler and this court. For purposes of this motion, only Charge 8 by the Board and Judge Stahler's findings relating thereto is pertinent. The Board charged that Judge McDonough violated Canon 5D of the Rules Governing the Conduct of Judges which states:

A judge should not serve as the executor, administrator, trustee, guardian, or other fiduciary, except for the estate, trust, or person of a member of his family, and then only if such service will not interfere with the proper performance of his judicial duties

and Canon 7A(1)(c) which provides in part:

A judge * * * should not:

\* \* \* \* \* \*

(c) * * * make a contribution to a political organization or candidate * * except as authorized in subsection A(2).

"in that he accepted money for serving as an appraiser of the estate of an unrelated person and subsequently paid over part of the appraisal fee to the judge who was a political candidate and who appointed Respondent as appraiser."

Judge Stahler found "No proof was presented by the Petitioner in respect to Charge 8 above and therefore it is found not proved." The Board amended this finding in August of 1978 as follows:

"That no proof was allowed by the Referee to be presented by Petitioner as to Paragraph IV 8 of the Complaint because the Respondent had raised the defense of Statute of Limitations (MS Section 490.16 Subd. 3) at the Pre-Trial Conference; that the Referee had ruled, by Pre-Trial Order of October 12, 1977, that the statute applied to the substance of said charge; that consequently Paragraph IV 8 of the Complaint has not been litigated herein."

Minn.Stat. § 490.16 (subd. 3) (1976), effective during the hearing before Judge Stahler, did in fact bar inquiry into the so-called "Bartholet Matter," dealt with at length by

this court in *In re Bartholet*, 293 Minn. 495, 198 N.W.2d 152 (1972). That section provided:

"\* \* \* [T]he supreme court may \* \* \* censure or remove a judge for action or inaction occurring not more than four years prior to such action being reported to the board on judicial standards \* \* \*." Minn.Stat. § 490.16, subd. 3 (1976).

In March of 1978 the statute of limitations was amended as follows:

The board is specifically empowered to reopen any matter wherein any information or evidence was previously precluded by a statute of limitations or by a previously existing provision of time limitation. Minn.Stat. § 490.16, subd. 3 (1978).

The operative facts of the "Bartholet Matter" occurred in 1966 and 1967. The old statute of limitations "restrict[ed] Supreme Court action to those incidents which were *reported* to the Board within four years of their occurrence \* \* \*." *McDonough*, 296 N.W.2d at 691. The Board does not dispute the fact that the then existing limitation period barred inquiry into the Bartholet Matter when it began its investigation in September of 1976 and when the case was before Judge Stahler. However, at the time of oral argument before this court the new statute of limitations was effective. By reply brief the Board indicated that it was aware of the repeal of the old limitation period. However, the Board did not request a remand for findings on the "Bartholet Matter" in its brief. Furthermore, at oral argument, this court asked the parties whether they wished a remand for any purpose.

Instead of requesting a remand, the Board's attorney stated:

"I truly don't. As a matter of fact, I think the precedent might be something that the Court would live to regret. There was a 6-week hearing here. If, even after that and a hearing before the Board the Board had this transcript. They had things they were not required to have by the Rules and even then if the Court remands back it seems that if this

case requires remand it is difficult to imagine one that wouldn't. The inquiry here has been so exhaustive I cannot imagine—I have evidence that I would like to have gotten in the record before Judge Stahler and I am sure Mr. Miley would say the same. None of us I suppose has ever tried a lawsuit in which we got all the evidence which we truly believed should go in evidence in evidence. I don't think anything would be gained."

In *In re McDonough*, 296 N.W.2d 648 filed March 23, 1979, we neither specifically addressed the issue of which limitation period applied to the "Bartholet Matter" nor expressly adopted or rejected the findings of the Board or Judge Stahler with respect to the "Bartholet Matter." Thus, we agree with the Board's argument that there has been no final decision on the issue of the statute of limitations. Therefore, the doctrine of res judicata is not directly applicable. Nevertheless, we find instructive several principles announced in *Youngstown Mines Corp. v. Prout*, 266 Minn. 450, 124 N.W.2d 328 (1963) and *Nelson v. Dorr*, 239 Minn. 423, 58 N.W.2d 876 (1953). We held that a judgment on the merits acts as a bar in a second suit based on the same cause of action and is conclusive not only as to every matter which was actually litigated but also as to every matter which *might have been* litigated. *Youngstown Mines Corp. v. Prout*, 266 Minn. at 466, 124 N.W.2d at 340. Furthermore, we recognized that a judgment acts as a bar in a subsequent action not only as to issues submitted in a prior suit but also as to issues covered in the pleadings which were not expressly determined in the first action and which were not withdrawn. *Nelson v. Dorr*, 239 Minn. at 431, 58 N.W.2d at 881.

We have expressed our preference for the inclusion of all charges of professional misconduct in one disciplinary complaint. *In re Williams*, 221 Minn. 554, 564, 23 N.W.2d 4, 9 (1946). *See also In re Peterson*, 178 N.W.2d 738, 741 (N.D.1970).

This case has consumed an incredible amount of time and energy of all those

involved for four years. The record before this court at the time of the first oral argument was enormous, consisting of over 4,000 pages of testimony and 245 exhibits. In short, the first investigation of Judge McDonough was detailed and thorough. Apparently the Board had similar sentiments since it expressly declined a possible opportunity to have the case remanded for further proceedings on the "Bartholet Matter" or any other matter.

In light of the foregoing, and on the peculiar facts of this case, it seems to us fundamentally unfair to reopen this investigation. Despite the fact that disciplinary proceedings are *sui generis*, we note that due process principles of fundamental fairness guarantee the subject of the investigation a certain regularity of proceedings as well as a certain finality of those proceedings. *Palko v. Connecticut*, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937), *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884). Therefore, pursuant to our inherent supervisory powers over disciplinary proceedings, we grant Judge McDonough's motion and hereby order the Board to close its file on the "Bartholet Matter."

So ordered.

TODD, YETKA and WAHL, JJ., took no part in the consideration or decision of this case.